870 A.2d 766

Michael S. HUTCHISON, Jr., by Mary J. HUTCHISON,
Parent and Natural Guardian, Appellants

v.

Father Francis LUDDY, St. Therese's Catholic Church, Bishop
James Hogan and Diocese of Altoona–Johnstown, Appellees.

Supreme Court of Pennsylvania.

Re–Submitted Sept. 29, 2004.

Decided March 22, 2005.

Thomas L. Cooper, Pittsburgh, Richard M. Serbin, Altoona, for, Michael S. Hutchison, Jr., by Mary J. Hutchison, Parent and Natural Guardian, Appellants.

Louis C. Long, Carl A. Eck, Pittsburgh, for St. Therese's Catholic Church, Appellee.

Philip Joseph Murren, Harrisburg, for Pennsylvania Catholic Conference, Appellee Amicus Curiae.

Before: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## *OPINION*

Justice CASTILLE.

This is an appeal from a Superior Court decision affirming in part and reversing in part the order of the trial court which, in pertinent part here, refused to set aside a jury award of punitive damages for a claim arising out of negligent supervision. The Superior Court held, as a matter of law, that punitive damages are unavailable on a claim sounding in negligent supervision under Section 317 of the Restatement (Second) of Torts. We disagree with the Superior Court's conclusion that punitive damages are never available for claims of negligent supervision. Accordingly, we vacate the order below and remand this matter for a determination of whether, under the appropriate standard discussed herein, the evidence in this case was legally sufficient to warrant the trial court's award of punitive damages.

Michael Hutchison, described as mildly retarded with a low I.Q., first met Catholic priest Fr. Francis Luddy in 1976, when Luddy became his priest and religious teacher in Altoona, Pennsylvania.[1] Approximately one year later, when Michael was ten to eleven years old, Luddy began sexually molesting him and the molestations continued on a frequent basis until Michael's family moved to Ohio in August 1982. Approximately six months later, when Michael was fifteen, he ran away from his new home in Ohio and returned to a hotel in Altoona to speak with Luddy about problems he was experiencing at home. Michael testified that he specifically requested that they not engage in any sexual activity. Nevertheless, Luddy visited Michael, spoke with him, sexually molested him and then gave him $200. A similar encounter occurred in 1984 when Michael was seventeen.

---

1. The facts are more fully discussed in this Court's previous opinion in this matter. *See Hutchison v. Luddy,* 560 Pa. 51, 742 A.2d 1052 (1999) (Opinion Announcing Judgment of Court).

Michael, by his mother, Mary J. Hutchison (collectively, appellants), brought the instant action in June of 1987. In addition to Luddy, appellants named as defendants the parish to which Luddy had been assigned (St. Therese's Catholic Church), as well as Bishop James Hogan and the Diocese of Altoona–Johnstown (the Diocesan Parties).[2] The complaint alleged causes of action for, *inter alia,* battery and intentional infliction of emotional distress by Luddy. The complaint against the Diocesan Parties sounded in negligent retention and supervision.

An eleven-week jury trial commenced on January 31, 1994. The jury returned its verdict on April 21, 1994, finding, in relevant part to this appeal, that the Diocesan Parties had knowledge that Luddy was molesting children; that they were negligent in their retention and supervision of Luddy; that they engaged in a pattern and practice of ignoring allegations of pedophilic behavior among priests; and that their negligence was a substantial factor in bringing about harm to Michael. The jury awarded appellants a total of $519,000.00 in compensatory damages. The jury also found that the conduct of all the defendants was outrageous, and therefore awarded appellants punitive damages totaling $1,050,000.00— fifty thousand dollars against Luddy personally and one million dollars against the Diocesan Parties premised upon the supervision claim.

The Diocesan Parties filed post-trial motions, which the trial court denied. The Diocesan Parties then appealed to the Superior Court, raising ten issues.[3] On September 4, 1996, a divided Superior Court panel vacated the judgment against the Diocesan Parties, on grounds that appellants had failed to

2. Luddy is not a party to this appeal and St. Therese's was absolved of liability in the previous appeal in this matter, as this Court held that the incidents which occurred while Luddy was assigned to St. Therese's and while Michael was a parishioner there were all barred by the statute of limitations. *See Hutchison v. Luddy,* 742 A.2d at 1056–57. For ease of discussion, we use the term "Diocesan Parties" to refer to the remaining defendants, Bishop Hogan and the Diocese.

3. Luddy filed his own post-trial motions and a separate appeal, both of which were eventually dismissed.

establish negligent supervision liability pursuant to Section 317 of the Restatement (Second) of Torts.[4] *Hutchison v. Luddy*, 453 Pa.Super. 420, 683 A.2d 1254, 1255–56 (1996) (Plurality Opinion by Brosky, J., with Tamilia, J., concurring in result). Given this finding, the plurality opinion did not reach any other issues. The Honorable Kate Ford Elliott dissented, noting that she would have affirmed the jury's verdicts regarding liability and compensatory damages against the Diocesan Parties because the evidence showed that they knew of Luddy's pedophilic behavior and should have known of the necessity to control that behavior. *Id.* at 1257–60 (Ford Elliott, J., dissenting). Judge Ford Elliott would have reversed the award of punitive damages, however, because she concluded that, while the conduct of the Diocesan Parties may have been "inept, exhibited a complete lack of understanding of the disease of pedophilia, and constituted gross negligence," there was insufficient evidence to prove that the conduct was "malicious, wanton or based on an evil motive." *Id.* at 1260–61.

This Court granted allocatur and affirmed in part and vacated and remanded in part. Like the Superior Court, this Court was unable to reach a majority consensus except as to mandate. Madame Justice Newman filed the Opinion Announcing the Judgment of the Court ("OAJC"), which was joined by then-Chief Justice Flaherty. The OAJC found that the Superior Court properly dismissed all claims against St. Therese's because its involvement with Luddy had ended prior

---

4. Restatement (Second) of Torts Section 317, which is entitled "Duty of Master to Control Conduct of Servant," provides:

> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
>> (a) the servant
>> (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
>> (ii) is using a chattel of the master, and
>> (b) the master
>> (i) knows or has reason to know that he has the ability to control his servant, and
>> (ii) knows or should know the necessity and opportunity for exercising such control.

to the incidents in question. The OAJC found, however, that the jury's compensatory damages verdict against Bishop Hogan and the Diocese was legally sustainable on the basis of negligent supervision liability under Section 317 of the Restatement (Second) of Torts. The OAJC thus vacated the Superior Court's order insofar as it entered judgment in favor of Bishop Hogan and the Diocese, and remanded the matter to the Superior Court for consideration of the numerous additional issues raised but not decided in the Diocesan Parties' appeal. *See Hutchison,* 742 A.2d at 1052 (OAJC by Newman, J.). Four Justices concurred only in the result. Mr. Justice (now Chief Justice) Cappy filed a Concurring Opinion emphasizing the standard of review and disassociating himself from the OAJC's criticism of Superior Court's exclusive focus upon Section 317 of the Restatement (Second) of Torts as the sole basis for recovery. Mr. Justice Nigro noted his concurrence in the result without opinion. Mr. Justice Saylor filed a separate Concurring Opinion, which was joined by then-Justice (later Chief Justice) Zappala, stating that he joined in the result, but was unable to join the OAJC's characterization of the Diocesan Parties' conduct as reckless and abhorrent because the question of punitive damages was for the Superior Court to determine, in the first instance, upon remand. Finally, this Justice dissented, opining that the governing law precluded any finding of liability against the Diocesan Parties on the facts as presented.

On remand, the Superior Court filed another published opinion disposing of the remaining claims. The panel ultimately reversed the award of punitive damages against the Diocesan Parties and entered judgment *non obstante veredicto* in the Diocesan Parties' favor on punitive damages, but otherwise affirmed the trial court. The panel majority appeared to consider the question of punitive damages on the Section 317 claim in conjunction with appellants' argument that the court should recognize a cause of action sounding in the **intentional** failure to supervise clergy. The panel noted that Pennsylvania courts have not yet recognized such a separate cause of action sounding in intentional conduct and, as an intermediate

appellate court, it was not inclined to enunciate and approve such a doctrine. The panel then noted that the cause of action governed by Section 317 is based upon ordinary negligence. In addition, the panel noted, it is settled that more than ordinary negligence must be shown in order to prove an entitlement to punitive damages. In the panel majority's view, because the Section 317 cause of action sounds in ordinary negligence, it cannot form the basis for an award of punitive damages. *See Hutchison v. Luddy,* 763 A.2d 826, 837 (Pa.Super.2000).[5]

■ This Court granted review again, this time to consider the question of whether the Superior Court properly determined that a negligent supervision claim sounding under Section 317 can never support an award of punitive damages.[6] The broad question of whether punitive damages may ever be appropriate under this cause of action is one of law as to which this Court's review is plenary. *Phillips v. A–Best Products Co.,* 542 Pa. 124, 665 A.2d 1167, 1170 (1995).

Appellants argue that the Superior Court erred in finding as a matter of law that a negligent supervision claim based upon Section 317 cannot support a claim for punitive damages. Appellants argue that, under Pennsylvania law, there is no proscription against awarding punitive damages for torts that sound in negligence. To the contrary, punitive damages are appropriate for torts sounding in negligence when the conduct goes beyond mere negligence and into the realm of behavior which is willful, malicious or so careless as to indicate wanton disregard for the rights of the parties injured. Brief for Appellant, 18 (*citing* Restatement (Second) of Torts § 908 (1979); *Moran v. G. & W.H. Corson, Inc.,* 402 Pa.Super. 101, 586 A.2d 416 (1991)). Appellants thus argue that punitive damages are proper if the factual circumstances of a particular

---

**5.** Judge Ford Elliott filed a Concurring and Dissenting Statement addressing an issue not relevant to the single issue which is now before this Court.

**6.** The Diocesan Parties cross-petitioned for allowance of appeal from other aspects of Superior Court's ruling, but this Court declined review. *See* No. 86 WAL 2001.

case reveal conduct that has passed into the level of outrageous conduct, even if mere ordinary negligence is all that was required to sustain a separate claim for compensatory damages.

In response, the Diocesan Parties argue that the Superior Court correctly found that a claim of negligence under Section 317, like any other claim based upon ordinary negligence, will not support an assessment of punitive damages. The Diocesan Parties note that Pennsylvania law consistently holds that punitive damages cannot be awarded for misconduct that constitutes mere ordinary negligence. The Diocesan Parties further note that the underlying tort of negligent hiring and supervision under Section 317 does not require proof of an evil motive or outrageous conduct—conduct which is the *sine qua non* of any award of punitive damages. The Diocesan Parties submit that, as the jury only found them liable on a theory of **negligent** supervision and hiring, there was an insufficient evidentiary basis, as a matter of law, to support the award of punitive damages. The Diocesan Parties further argue that, because there was no other tortious activity pled or proven which demonstrated that the Diocesan Parties had the requisite culpable state of mind to warrant punitive damages, the award here cannot stand.

The standard governing the award of punitive damages in Pennsylvania is settled. "Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742, 747 (1984) (*quoting* Restatement (Second) of Torts § 908(2) (1979)); *see also Chambers v. Montgomery,* 411 Pa. 339, 192 A.2d 355, 358 (1963). As the name suggests, punitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct. *See SHV Coal, Inc. v. Continental Grain Co.,* 526 Pa. 489, 587 A.2d 702, 704 (1991); *Feld,* 485 A.2d at 747–48; *Chambers,* 192 A.2d at 358. *See also* Restatement (Second) of Torts § 908, comment b. The purpose of punitive damages is to punish a tortfeasor for

outrageous conduct and to deter him or others like him from similar conduct. *Kirkbride v. Lisbon Contractors, Inc.*, 521 Pa. 97, 555 A.2d 800, 803 (1989); Restatement (Second) of Torts § 908(1) ("Punitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future."). Additionally, this Court has stressed that, when assessing the propriety of the imposition of punitive damages, "[t]he state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious." *See Feld*, 485 A.2d at 748; *see also Martin v. Johns–Manville Corp.*, 508 Pa. 154, 494 A.2d 1088, 1097 n. 12 (1985) (plurality opinion).[7]

In *Martin*, this Court considered the requisite state of mind which would constitute reckless indifference in this context, and we set forth the standard the courts are to apply when called upon to determine whether the evidence supports a punitive damages award on such a basis. Noting that Comment *b* to Section 908(2) of the Restatement refers to Section 500 as defining the requisite state of mind for punitive damages based on reckless indifference, this Court turned to Section 500, which states:

§ 500  Reckless Disregard of Safety Defined

The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

Restatement (Second) of Torts § 500.

Noting that Section 500 sets forth two very different types of state of mind as to reckless indifference, *Martin* stated that the first is "where the 'actor knows, or has reason to know,

7.  Although *Martin* was a plurality, its discussion and analysis regarding punitive damages was approved and followed in *SHV Coal, Inc.*, 587 A.2d at 704–05.

... of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk;'" and that the second is "where the 'actor had such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so.'" *Martin,* 494 A.2d at 1097 (quoting Restatement § 500 Comment *a*). *Martin* recognized that the first type of reckless conduct described in Section 500 "demonstrates a higher degree of culpability than the second on the continuum of mental states which range from specific intent to ordinary negligence[,]" because "[a]n 'indifference' to a known risk under Section 500[,] is closer to an intentional act than the failure to appreciate the degree of risk from a known danger." *Id.*

The *Martin* Court then stated that "[u]nder Pennsylvania law, only the first type of reckless conduct described in comment *a* to Section 500, is sufficient to create a jury question on the issue of punitive damages[,]" rejecting as insufficient the second type of recklessness, which is premised on a "reasonable man standard." *Id.* at 1097–98. In other words, this Court concluded that "an appreciation of the risk [of harm] is a necessary element of the mental state required for the imposition of [punitive] damages." *Id.* at 1097 n. 12. In this regard, we reasoned that:

> The only purpose of punitive damages is to deter outrageous conduct. It is impossible to deter a person from taking risky action if he is not conscious of the risk. Thus, in *Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742 (1984), we addressed the issue of when punitive damages are warranted and stressed that, in determining whether certain conduct is outrageous, "[t]he state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious." Similarly, the Restatement explains that "reckless indifference to the rights of others and conscious action in *deliberate* disregard of them ... may provide the necessary state of mind to justify punitive damages." Comment *b* (emphasis added). Therefore, an appreciation of the risk

is a necessary element of the mental state required for the imposition of such damages.

*Id.*

Thus, in Pennsylvania, a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk. *Id.* at 1097–98.

In overturning the jury award of punitive damages in this case, the Superior Court panel did not view the question before it as requiring application of the settled punitive damages standard to the facts of the case. Instead, the panel concluded that, since the **cause of action** for negligent supervision may succeed upon a showing of ordinary negligence, and an award of punitive damages requires far more than ordinary negligence, negligent supervision causes of action can **never** be the basis for an award of punitive damages. In so holding, the panel conflated theories of liability with the distinct issue of damages, misconstrued this Court's precedent, and thereby committed an error of law.

The Diocesan Parties should recognize the confusion, since they note in their brief that "no independent action exists for a claim of punitive damages because punitive damages are only an element of damages." Brief for Appellees, 16 (*citing Kirkbride, supra*). The fact that a cause of action bottomed on negligence does not require proof of the heightened showing of culpability necessary to sustain punitive damages in order to secure the underlying compensatory damages does not mean that punitive damages—as an element of damages— should be deemed automatically unavailable, even if the conduct of the defendant(s) went well beyond negligence and into the realm of the outrageous. The penal and deterrent purpose served by an award of punitive damages is furthered when the outrageous conduct occurs in a case sounding in negligence no less than when an intentional tort is at issue.

We do not dispute that a showing of ordinary negligence is not enough to warrant punitive damages. And so, a jury cannot be instructed that, having found negligence, an award of punitive damages is appropriate. But, neither is there anything in law or logic to prevent the plaintiff in a case sounding in negligence from undertaking the additional burden of attempting to prove, as a matter of damages, that the defendant's conduct not only was negligent but that the conduct was also outrageous, and warrants a response in the form of punitive damages.

■ Consistently with the analysis above, it is notable that many of the leading cases discussing the test for punitive damages in Pennsylvania have arisen in lawsuits involving causes of action sounding in negligence. For example, in *Feld*, the plaintiffs alleged that their landlord was negligent in providing inadequate security for an apartment complex under Section 323 of the Restatement (Second) of Torts (governing negligent performance of undertaking to render services). While this Court ultimately held that the trial court wrongly submitted the issue of punitive damages to the jury, we did so not because punitive damages are unavailable in negligence actions, but because there was an insufficient factual basis for the jury to conclude that the landlord had acted outrageously:

> [T]he evidence presented was insufficient to support a finding that [the landlord] acted with the state of mind necessary to impose punitive damages. While the record indicates that the security systems might have been inadequate under the circumstances, there was no evidence of an evil motive or a reckless indifference to the safety of the tenants.

485 A.2d at 748. Additionally, in *Rizzo v. Haines,* 520 Pa. 484, 555 A.2d 58 (1989), the plaintiffs sued their former attorney for malpractice, alleging that he acted negligently in settlement negotiations. This Court found that an award of punitive damages was proper for claims sounding in breach of fiduciary duty, as well as intentional withholding of informa-

tion and fraudulent misrepresentation. *See id.* at 69. Punitive damages were thus appropriate for a claim that sounded, at least partially, in a claim based on negligence. *Accord, SHV Coal,* 587 A.2d at 703–05 (affirming award of punitive damages for claim based, in part, on negligence sounding in breach of fiduciary duty).

We see no reason, and the Superior Court and Diocesan Parties have articulated none, to distinguish between claims sounding under Section 317 and other actions sounding in negligence for purposes of punitive damages. It may be that, as a practical matter, it proves more **difficult** to sustain a claim for punitive damages against the "master" in the negligent supervision context than it might be with other negligence-based torts, given that the more direct harm (which, as here, may well involve an intentional tort) will usually have been inflicted directly by the "servant." But, that is a matter for proof that attends the particular case; there is no general proscription in law against pursuing punitive damages in the Section 317 context, where the facts so warrant.

Accordingly, we reject the Superior Court's conclusion that punitive damages are unavailable, as a matter of law, in an action for negligent supervision. We remand the matter to the Superior Court to determine whether the jury's award of punitive damages against the Diocesan Parties was properly supported by the evidence.

Vacated and remanded. Jurisdiction relinquished.