Michael S. HUTCHISON, Jr., By Mary J. Hutchison, Parent and Natural Guardian

v.

Father Francis LUDDY, St. Therese's Catholic Church, Bishop James Hogan and Diocese of Altoona–Johnstown.

Appeal of: St. Therese's Catholic Church, Bishop James Hogan and Diocese of Altoona–Johnstown, Appellants.

Superior Court of Pennsylvania.

Argued Oct. 25, 2005.

Filed March 22, 2006.

Eric N. Anderson, Pittsburgh, for appellant.

Richard M. Serbin, Altoona, for appellees.

BEFORE: FORD ELLIOTT, TODD, and TAMILIA, JJ.

OPINION BY FORD ELLIOTT, J.:

¶ 1 On second remand from our supreme court, we are asked to decide a single issue: whether the evidence presented in this case supported the jury's award of punitive damages against the Diocesan parties. We find the evidence supported the award and therefore affirm.

¶ 2 This case has traveled a long and tortured path through our appellate courts since it arrived on our dockets in July of 1994. Prior to its arrival here, the case, which began with the filing of a complaint in 1987, resulted in an order, affirmed on appeal, to unseal the Diocesan records containing information regarding instances of priest pedophilia in the Diocese.[1] The case then proceeded through years of depositions and discovery and finally reached a jury for an 11–week trial in January 1994.

¶ 3 "The heart of the controversy is the alleged sexual molestation of appellee Michael Hutchison, "(Michael") a minor male with limited mental competency, by Father Francis Luddy, a Catholic priest." *Hutchison v. Luddy*, 763 A.2d 826, 829 (Pa.Super.2000) ("*Hutchison III*"). Michael's mother Mary Hutchison brought an action against Father Luddy and also against the Diocesan parties: St. Therese's Catholic Church ("St. Therese's"), Bishop James Hogan ("Bishop Hogan"), and the Diocese of Altoona–Johnstown ("the Diocese"). On April 19, 1994, the jury returned its verdict, finding in favor of Michael and against all defendants. The jury awarded $519,000 in compensatory damages, assigning 36% to Father Luddy, 53% to Bishop Hogan and/or the Diocese, and 11% to St. Therese's. In addition, the jury awarded $50,000 in punitive damages against Father Luddy and $1 million in punitive damages against the remaining defendants, collectively "the Diocesan parties."

¶ 4 Following the denial of both Father Luddy's and the Diocesan parties' motions for post-trial relief, each filed an appeal to this court. Father Luddy's appeal was subsequently dismissed. The Diocesan parties raised ten issues in their appeal; however, a panel of this court addressed only the first of those issues: "Whether the trial court erred in allowing Michael to proceed under the theory set forth in Restatement (Second) of Torts § 317 for negligent hiring, supervision, and retention of

---

1. The psychiatric community refers to the conduct at issue in this case, involving sexual attraction to minors, adolescents, and children under the age of consent, as ephebophilia; and sexual attraction to prepubertal children as pedophilia. (Notes of testimony, 4/11,13–14/94 at 277.) For ease of discussion, however, we refer to the instances of sexual attraction and molestation at issue in this case as pedophilia.

Luddy by appellants." *Hutchison v. Luddy*, 453 Pa.Super. 420, 683 A.2d 1254, 1255 (1996) ("*Hutchison I* ").[2]

¶ 5 Writing for the majority in *Hutchison I*, the Honorable John Brosky concluded the Diocesan parties could not be liable pursuant to § 317, and the Honorable Patrick J. Tamilia concurred in the result, thereby entering judgment notwithstanding the verdict ("jnov") in favor of all of the Diocesan parties. *Hutchison I*, 683 A.2d at 1256. This author dissented, agreeing that jnov should have been granted as to the punitive damages claim but disagreeing that Michael had failed to present evidence to support a § 317 liability claim. *Hutchison I*, 683 A.2d at 1256–1261 (Ford Elliott, J., dissenting). This author questioned, however, whether the trial court properly admitted evidence of a pattern or practice of the Diocese in its handling of other claims of pedophilic conduct involving other priests. *Id.* at 1261–1262.

¶ 6 Our supreme court granted allocatur and vacated this court's order, holding that the jury properly found the Diocesan parties liable pursuant to § 317, negligent supervision. *Hutchison v. Luddy*, 560 Pa. 51, 67, 742 A.2d 1052, 1060 (1999) (plurality) ("*Hutchison II* "). The *Hutchison II* court found St. Therese's was not liable, however, because Father Luddy had left St. Therese's prior to the incidents that survived the statute of limitations. *Id.* at 61, 742 A.2d at 1057.

¶ 7 Having concluded that the jury's verdicts against the Diocesan parties were legally sustainable, our supreme court remanded for this court to consider the issues those parties raised but that this court did not decide in *Hutchison I*. *Hutchison II, supra* at 70, 742 A.2d at

1062. Thus, in *Hutchison III, supra,* the same panel that decided *Hutchison I* addressed the Diocesan parties' remaining nine issues. Particularly germane herein was the panel's conclusion that evidence of the Diocesan parties' awareness and handling of other instances of pedophilia involving other priests was properly admitted as it was highly probative as to the question of the Diocese's notice or knowledge to sustain a § 317 claim. *Hutchison III*, 763 A.2d at 842. *See id.* at 839–841 (setting forth the facts surrounding the Diocesan parties' knowledge regarding other priests). *See also id.* at 841 (holding that Father Luddy's history of pedophilia and other problems, which he acknowledged, was properly admitted to assess his credibility as he continued to deny he molested Michael). As the *Hutchison III* court opined:

> The crucial issue with respect to Appellants' liability is their knowledge when confronted with signs that Luddy was engaging in improper conduct. Liability could attach to Appellants only if the jury determined that they 'knew or should have known' that they should exercise control over Luddy. Whether Luddy was the first known priest-pedophile with whom Appellants had experience is clearly relevant to a determination of whether they 'should have known' about his improper conduct at some point prior to Michael's unfortunate experiences. Clearly an individual or organization which has been exposed to and has had some experience in dealing with a particular situation may better be able to recognize a subsequent, similar situation.

*Id.* at 845.

¶ 8 With regard to the jury's punitive damages award, however, the *Hutchison*

---

**2.** *See Hutchison III,* 763 A.2d at 831–832, setting forth all of the Diocesan parties' issues on appeal.

*III* panel concluded that: (a) because the only remaining cause of action upon which the jury could properly award damages was negligent supervision pursuant to § 317; and (b) because punitive damages cannot be awarded for misconduct that constitutes only ordinary negligence; therefore, (c) a negligent supervision claim cannot support a claim for punitive damages. *Hutchison III*, 763 A.2d at 837, citing *Mullen v. Topper's Salon and Health Spa, Inc.*, 99 F.Supp.2d 553 (E.D.Pa.2000).[3]

¶ 9 Once again, our supreme court granted allocatur limited to the narrow issue whether this court "properly determined that a negligent supervision claim sounding under § 317 can never support an award of punitive damages." *Hutchison v. Luddy*, 582 Pa. 114, 120, 870 A.2d 766, 769 (2005) ("*Hutchison IV*"). After reviewing cases in which a claim grounded in negligence supported a punitive damages award, the supreme court concluded that an action bottomed in § 317 can sustain an award of punitive damages, providing that the plaintiff can show "the conduct of the defendant[s] went well beyond negligence and in to the realm of the outrageous." *Id.* at 124, 870 A.2d at 772. As Justice Castille, writing for a unanimous court, recognized, however:

> It may be that, as a practical matter, it proves more **difficult** to sustain a claim

for punitive damages against the 'master' in the negligent supervision context than it might be with other negligence-based torts, given that the more direct harm (which, as here, may well involve an intentional tort) will usually have been inflicted directly by the 'servant.' But, that is a matter for proof that attends the particular case; there is no general proscription in law against pursuing punitive damages in the Section 317 context, where the facts so warrant.

*Id.* at 126, 870 A.2d at 773 (emphasis in *Hutchison IV*).

¶ 10 Our supreme court therefore remanded the case to this court "to determine whether the jury's award of punitive damages against the Diocesan Parties was properly supported by the evidence." *Id.* With the retirement of Judge Brosky, the court appointed Judge Debra Todd to the panel, which heard oral argument on the narrow issue before this court.

¶ 11 We begin our analysis by observing that when we review a trial court's denial of a motion for a new trial or for jnov, "our standard is narrow: we will reverse the decision of the trial court only if we find an abuse of discretion or an error of law that controlled the outcome of the case." *Hutchinson v. Penske Truck Leasing Co.*, 876 A.2d 978, 984 (Pa.Super.2005), citing

---

**3.** In *Hutchison I*, this author, writing in dissent, stated that the evidence concerning the Diocesan parties' reactions to instances of pedophilia indicated they were at worst inept and grossly negligent. *Hutchison I*, 683 A.2d at 1261 (Ford Elliott, J., dissenting). At that time, this author did not agree that evidence of the Diocese's response to instances of pedophilia involving other priests should have gone to the jury. *Id.* at 1261–1262. However, because the majority concluded jnov was appropriate as to the entire jury verdict, including punitive damages, this author chose not to engage in an extensive analysis of that evidence or that issue at that time. *Id.*

In *Hutchison III*, this author again noted her disagreement with allowing evidence of the Diocesan pattern or practice of dealing with other complaints of pedophilia involving other priests to go to the jury. *Hutchison III*, 763 A.2d at 853. The majority's analysis on that point is now, however, the law of the case, as our supreme court denied the Diocesan parties' petition for allowance of appeal from the *Hutchison III* court's affirmance of the trial court's order. *Hutchi[ ]son v. Luddy*, 567 Pa. 743, 788 A.2d 377 (2001).

*Colville v. Crown Equip. Corp.,* 809 A.2d 916, 926 (Pa.Super.2002), *appeal denied,* 574 Pa. 742, 829 A.2d 310 (2003) (other citation omitted). "Abuse of discretion occurs if the trial court renders a judgment that is manifestly unreasonable, arbitrary or capricious; that fails to apply the law; or that is motivated by partiality, prejudice, bias or ill-will." *Id.,* citing *Colville,* 809 A.2d at 926.

¶ 12 "When reviewing an appeal from the denial of a request for judgment n.o.v., the appellate court must 'view the evidence in the light most favorable to the verdict winner and give him or her the benefit of every reasonable inference arising therefrom while rejecting all unfavorable testimony and inferences.'" *Faherty v. Gracias,* 874 A.2d 1239, 1245–1246 (Pa.Super.2005), quoting *The Birth Ctr. v. The St. Paul Companies, Inc.,* 567 Pa. 386, 397, 787 A.2d 376, 383 (2001). As the *Faherty* court continued, "Thus, the grant of a judgment n.o.v. 'should only be entered in a clear case and any doubts must be resolved in favor of the verdict winner.'" *Id.* at 1246, quoting *Atkins v. Urban Redevelopment Authority of Pittsburgh,* 489 Pa. 344, 414 A.2d 100 (1980). Furthermore, "It is only when either 'the movant is entitled to judgment as a matter of law' or 'the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant' that an appellate court may vacate a jury's finding." *Id.,* quoting *Moure v. Raeuchle,* 529 Pa. 394, 402, 604 A.2d 1003, 1007 (1992).

▮▮▮▮ ¶ 13 Pursuant to *Hutchison IV,* " 'Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.'" *Hutchison IV, supra* at 121, 870 A.2d at 770, quoting *Feld v. Merriam,* 506 Pa. 383, 395, 485 A.2d 742, 747 (1984), quoting Restatement (Second) of Torts § 908(2) (1979) (other citation omitted). Further, "[P]unitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct." *Id.* (citations omitted). Because punitive damages are intended to punish the tortfeasor for outrageous conduct and to deter him and others like him from similar conduct in the future, " '[t]he state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious.'" *Id.* at 121–122, 870 A.2d at 770–771, quoting *Feld, supra* at 396, 485 A.2d at 748; citing *Martin v. Johns–Manville Corp.,* 508 Pa. 154, 171 n. 12, 494 A.2d 1088, 1097 n. 12 (1985) (plurality opinion).[4]

¶ 14 As the *Hutchison IV* court further observed, when the *Martin* court considered the requisite state of mind necessary to constitute reckless indifference, the court adopted only the first type of reckless conduct set forth in § 500 of the Restatement, "Reckless Disregard of Safety Defined":

> 'The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, ***knowing or having reason to know*** of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which

---

**4.** As the *Hutchison IV* court recognized, while *Martin* was a plurality decision, its discussion and analysis regarding punitive damages were approved and followed in *SHV Coal,* *Inc. v. Continental Grain Co.,* 526 Pa. 489, 493–94, 587 A.2d 702, 704–705 (1991). *Hutchison IV, supra* at 122 n. 7, 870 A.2d at 771 n. 7.

is necessary to make his conduct negligent.'

*Id.*, quoting Restatement (Second) of Torts § 500 (emphasis added). Pursuant to this test, the actor must not only know or have reason to know of facts that create a high degree of risk, but must deliberately proceed to act in conscious disregard of, or indifference to, that risk. *Id.*, citing *Martin, supra* at 171, 494 A.2d at 1097 (other citation omitted).

¶ 15 The state of mind of the actor in Pennsylvania therefore requires a higher degree of culpability than the alternative state of mind set forth in § 500, necessitating only that while the actor is or should be aware of the facts, the actor does not realize or appreciate the high degree of risk involved, even though a reasonable person in his position would do so. In this regard, our supreme court reasoned:

> 'The only purpose of punitive damages is to deter outrageous conduct. It is impossible to deter a person from taking risky action if he is not conscious of the risk. Thus, in *Feld v. Merriam*, 506 Pa. 383, 485 A.2d 742 (1984), we addressed the issue of when punitive damages are warranted and stressed that, in determining whether certain conduct is outrageous, "[t]he state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious." Similarly, the Restatement explains that "reckless indifference to the rights of others and conscious action in *deliberate* disregard of them ... may provide the necessary state of mind to justify punitive damages." [Section 500] Comment b (emphasis in *Hutchison IV*). Therefore, an appreciation of the risk is a necessary element of the mental state required for the imposition of such damages.'

*Id.* at 123–124, 870 A.2d at 771–772, quoting *Martin, supra* at 171 n. 12, 494 A.2d at 1097 n. 12.

¶ 16 As the *Hutchison IV* court therefore opined:

> Thus, in Pennsylvania, a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk.

*Id.* at 124, 870 A.2d at 772, citing *Martin, supra* at 171–172, 494 A.2d at 1097–1098.

¶ 17 Also of particular importance to our analysis herein is the recognition in Pennsylvania that " 'While the commission of an act charged cannot be proved by showing the commission of a like act at a different time, an exception to this rule exists where knowledge or intent is a material fact to be proved.' " *Hutchison III*, 763 A.2d at 842, quoting *General Equipment Manufacturers v. Westfield Ins. Co.* (*"General Equipment"*), 430 Pa.Super. 526, 635 A.2d 173, 185 (1993), *appeal denied*, 537 Pa. 663, 644 A.2d 1200 (1994) (citations omitted in *Hutchison III* ). *Accord Jones v. Faust*, 852 A.2d 1201, 1205 (Pa.Super.2004.) *See also Keiter v. Miller*, 170 A. 364, 365 (Pa.Super.1934) (providing that the cases excepted from the general rule that the commission of the act charged cannot be proved by showing a like act to have been committed by the same person are those in which "the knowledge or intent of the party was a material fact to be proved, and on which the evidence, apparently collateral, had a direct bearing[ ]"), citing 1 Greenleaf on Evidence, § 53; Stephen's Digest of the Law of Evidence, art. 11.

¶ 18 As the *General Equipment* court continued, "Under such circum-

stances, evidence of similar acts or transactions is admissible when relevant to prove an issue in the case." *General Equipment*, 635 A.2d at 185 (citations omitted). Continuing, the *General Equipment* court recognized, "Accordingly, evidence of a course of conduct or dealing followed by a person may be admitted to prove that he acted in accordance with it on a given occasion, provided such a course of conduct or dealing is shown to have been continuous and systematic." *Id.*, citing *Pennsylvania Company v. Philadelphia Electric Co.*, 331 Pa. 125, 200 A. 18 (1938); *White v. Rosenthal*, 173 Pa. 175, 33 A. 1027 (1896).

 ¶ 19 We have already referred to evidence of the Diocesan parties' pattern or practice in handling complaints of priest pedophilia, set forth in *Hutchison III*, 763 A.2d at 839–841.[5] Although the *Hutchison III* panel did not reach the issue whether the evidence supported a finding of intent with regard to a punitive damages claim, the panel found the evidence admissible for the purpose of showing whether the Diocesan parties knew or should have known of Luddy's pedophilic behavior for purposes of § 317 liability based upon the parties' familiarity with such incidents, which should have put the parties on notice so they could respond more appropriately to the Luddy situation. *Id.* at 838–839.

¶ 20 Because our supreme court requires us to determine whether the evidence admitted at trial also supports a claim for punitive damages, we set forth additional evidence with which the jury was presented regarding the Diocesan par-

ties' conduct, keeping in mind the evidence must be sufficient to establish that "(1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Hutchison IV, supra* at 124, 870 A.2d at 772, citing *Martin, supra* at 171–172, 494 A.2d at 1097–1098. Pursuant to this test, the actor must " 'know[ ] or ha[ve] reason to know ... of facts which create a high degree of risk ..., and deliberately proceed[ ] to act, or fail to act, in conscious disregard of, or indifference to, that risk[.]' " *Id.* at 122–123, 870 A.2d at 771, quoting *Martin, supra* at 171, 494 A.2d at 1097 (other citation omitted).

¶ 21 We address first the evidence indicating the Diocesan parties subjectively knew or had reason to know of facts creating a high degree of risk to the children and families of the Diocese. With regard to the general subject of pedophilia, Bishop Hogan, who had a degree in Canon Law, acknowledged that Law required him to investigate claims of child sexual molestation, being "very much concerned with the person against whom the complaint is filed, ... but at the same time proceed[ing] with all due regard for the welfare of the person that the complaint touches." (Notes of testimony, 3/14–18/94 at 172.)[6] Bishop Hogan also testified that under Canon Law, a priest having any contact with the genitalia of a child is considered very serious. (Notes of testimony, 3/10–11/94 at 111–112.)

---

**5.** Because the *Hutchison IV* court remanded for this court to determine whether the jury heard sufficient evidence to support a claim for punitive damages, this author would be remiss in her responsibility to this court, our supreme court, and, most importantly, the parties, if she did not thoroughly review all of the evidence the *Hutchison III* panel found to have been properly submitted to the jury in its consideration of the verdict.

**6.** Canon Law is the law of the Roman Catholic Church.

¶ 22 Dr. Frank Valcour, a psychiatrist and one of the Diocesan parties' experts, testified that prior to 1980, pedophilia was considered an antisocial act, a wrongful act, a moral lapse, a bad thing to do, and in most jurisdictions, a crime. (Notes of testimony, 4/11,13–14/94 at 279.) Monsignor Saylor, who was subpoenaed to testify after trial commenced based on information plaintiffs' counsel received during trial, testified he reported an instance of pedophilia to Bishop Hogan in 1975, at which time Bishop Hogan directed the Monsignor to arrange for out-patient psychiatric care for the priest. (Notes of testimony, 3/14–18/94 at 798–805.) Based on Monsignor Saylor's testimony, Dr. Fred Berlin, another of the Diocesan experts, acknowledged Bishop Hogan apparently knew by 1975 that, at least in that instance, a priest who was sexually involved with a child required a minimum of out-patient psychiatric intervention. (Notes of testimony, 4/11,13–14/94 at 683–684.) Bishop Hogan also knew by 1979 that sexual molestation is bad for a child, especially if the priest is the molester. (Notes of testimony, 3/14–18/94 at 378.)

¶ 23 In addition, the jury heard evidence that other Diocesan parties, including Monsignors Kiniry, Saylor, Madden, and Kline, knew molesting a child was morally and/or legally wrong. (Notes of testimony, 3/7–8/94 at 322; 3/14–18/94 at 790–792; 3/21–25/94 at 773, 963–964.) The jury also had before it evidence in the form of letters parents of some of the abused boys wrote to Bishop Hogan, asking him to transfer or otherwise remove the offending priest because their children and families were being harmed by the priest's continuing presence in the parish.

¶ 24 In order to put these letters, which go to the Diocesan parties' subjective appreciation of the risk of harm, in context, we will first set forth the evidence the jury heard, as set forth in *Hutchison III*, regarding each incident. For the sake of clarity, we will then address the second prong of a punitive damages claim, evidence of acting, or failing to act, in conscious disregard of the risk, as it pertains to each incident. We start with the second priest the *Hutchison III* panel discussed, Father G.[7]

There was a second priest about whom Bishop Hogan received complaints of unpriestly behavior beginning in 1972. In March of 1984, Bishop Hogan received two letters from parishioners, but, rather than contacting the parishioners, he contacted the priest. The priest admitted to sexual involvement with children but stated that nothing sloppy had occurred with the boys. Bishop Hogan gave the second priest a good dressing down. Bishop Hogan took no further action until the Pennsylvania State Police became involved. Bishop Hogan wrote a letter to the second priest and directed him to keep his big mouth shut with regard to his having sexually molested the boys. Bishop Hogan sent this second priest away from the parish for professional help.

*Hutchison III*, 763 A.2d at 840.

¶ 25 Father G. received "a good dressing down" but nothing more after Bishop Hogan received a letter from one boy and from the mother of another boy Father G. had molested in or around 1982. After describing the circumstances involving Father G.'s attempted molestation, the boy wrote:

our supreme court have avoided using the names in published opinions; therefore, we will continue this practice.

7. Although the names of the priests and the children were used at trial and are therefore part of the public record, both this court and

I pushed his hand away and I couldn't believe this was happening. I was really shocked when he tried it again. He tried it three or four more times. I then drew my fist back, but I couldn't hit him. I told him to quit.... He said he was sorry and admitted to me that he had made sexual contact with boys that he had working for him in the past. He also told me he had other instances with other guys. I think the man needs help with his problem because I know of ... at least one person besides me that Father [G.] has tried this with. I have talked with his mother and she said he is also very upset and hurt. I think something has to be done before someone else gets hurt real bad.... I hope something can be done.

Notes of testimony, 3/9–11/94 at 25–27. Bishop Hogan did not respond to this letter although the boy gave his address, and did not contact Father G. for an explanation.

¶ 26 With regard to the second boy, the boy's mother wrote to Bishop Hogan in 1984, describing an incident that occurred two years earlier, in which Father G. made sexual advances toward her son, who was working at the church mowing the lawn and painting. One evening when the boy's parents went to pick him up, they found him over a mile away from the church, having fled in terror when Father G. told the boy he would wait until later to renew his advances. The mother called Father G. that night and confronted him. Father G. did not deny any of it, asking only for forgiveness and saying he "would try to control his homosexual tendencies that he had for some time." (*Id.* at 37–39.)

¶ 27 Because her son did not want Father G. to lose his priesthood or harm him in any way, the mother waited two years to write to the Bishop. During the two-year period, the mother saw her son change from a quiet, trusting person to someone who no longer trusted people or cared about anything, especially himself. Despite her son's belief it would be his fault if Father G. were disciplined in any way, the mother wrote to the Bishop out of fear Father G. would hurt another boy and his family the way her son and family had been hurt. *Id.* at 39–41. Bishop Hogan testified he did not contact either of the boys or the mother. (*Id.* at 42.)

¶ 28 After the state police got involved, Bishop Hogan agreed to send Father G. to Orchard Lake, a seminary for boys of Polish extraction Father G. attended as a youth, for a one-month sabbatical, during which he received psychiatric treatment. (Notes of testimony, 3/7–8/94 at 77, 86, 127.) At the end of the month, Bishop Hogan assigned Father G. as a pastor at two parishes, where he would have no supervision, and did not notify anyone at these parishes regarding Father G.'s admitted history. (Notes of testimony, 3/10–11/94 at 77–78.)

¶ 29 Upon receiving renewed complaints concerning Father G. after he was reassigned, Bishop Hogan wrote to him in December 1985 but did nothing further. Father G. was still a priest in the Diocese when Bishop Hogan retired in 1987. (*Id.* at 95–96.)

¶ 30 Turning to the third priest the *Hutchison III* panel discussed, Father K., the panel observed:

There was also a third priest in the Diocese about whom Hogan received notification of pedophilic activity in 1982. Bishop Hogan confronted the priest and attributed the matter to an isolated falling apart. The third priest admitted to having engaged in a number of sexual acts over a period in excess of a year

with a fifteen-year-old boy.[8] The only allegation made by the boy that the priest denied to Bishop Hogan was that he engaged in sodomy. Bishop Hogan took the priest's word that he could correct the problem, and he took no action toward him except to check on him at his parish seven to eight times in the following five years.

*Hutchison III,* 763 A.2d at 840–841.

¶ 31 Bishop Hogan received two letters from the parents of the boy Father K. molested. After receiving a letter from the Bishop in which he outlined his discussion with Father K., the boy's father wrote to Bishop Hogan on October 8, 1982, indicating that his son no longer wished to be an altar boy and that the family was no longer comfortable receiving Holy Communion from Father K. or having Father K. hear confession. The boy's father therefore asked the Bishop to transfer Father K. to another parish. (Notes of testimony, 3/14–18/94 at 198–200.) The boy's father indicated, however, the family would be willing to live by the Bishop's decision. (*Id.* at 200.)

¶ 32 Almost one year later, on September 22, 1983, the boy's mother wrote to Bishop Hogan when she discovered Father K. was not among the priests who were to be reassigned to another parish during the ensuing year. According to the boy's mother, her son had been diagnosed with migraine headaches during the preceding year, which the experts attributed to stress as the boy was so young, and which the mother attributed to the stress of the boy's having repeatedly to encounter Father K. The mother therefore pointedly asked Bishop Hogan to remove Father K.

from the parish. (Notes of testimony, 3/7–8/94 at 248–249.) Bishop Hogan neither contacted the family nor transferred Father K., who was still the pastor at the same church four years later, when Bishop Hogan retired. (*Id.* at 249–250.)

¶ 33 The jury also heard evidence regarding another priest, Father C., whose pedophilic activities first came to Bishop Hogan's attention in 1979. The *Hutchison III* panel discussed Father C. in its opinion:

Upon receiving the first complaint about a priest in 1979, Bishop Hogan confronted the priest with the allegation. The priest denied the allegation that he had rubbed his penis on a ten-year-old boy's feet. Bishop Hogan did not consider the allegation to be pedophilic behavior, and he transferred the priest to another church.

*Hutchison III,* 763 A.2d at 840. Bishop Hogan testified that the parents who accused Father C. of the incident outlined *supra* indicated there were three boys whom Father C. would invite to the rectory when the pastor was away. (Notes of testimony, 3/7–8/94 at 69–70.) Bishop Hogan also testified Father C. admitted the boys slept over at the rectory and he hypnotized them. (*Id.* at 270–272.) Excerpts from Bishop Hogan's letter to Father C. regarding this incident follow:

Painful as the situation is, we must safeguard your own good name, protect the priestly reputation and prevent scandal from touching the church—even if unjust. . . .

At the moment I seek one to take your place, as I do a fitting place for

---

**8.** The acts to which Father K. admitted, which took place over a period of one year, included fondling the boy's exposed genitals and having the boy fondle his exposed genitals; showing the boy X-rated movies and encouraging him to drink alcohol, and "making dirty remarks with respect to passing girls." (Notes of testimony, 3/7–8/94 at 161–167.)

you—after you have had a few days of needed rest.

Notes of testimony, 3/7–8/94 at 275.

¶ 34 As the *Hutchison III* panel observed:

> Seven years later, in 1986, Bishop Hogan began receiving additional similar complaints about that same priest from his pastor, Monsignor Kiniry, who stated that both he and the parish school's principal had been receiving complaints for over six months. This priest was sent for treatment, but remained an active priest in the Diocese until Hogan retired in 1987.

*Hutchison III*, 763 A.2d at 840. In response to these additional complaints, Bishop Hogan wrote to Father C. on January 17, 1986, and, after outlining the steps the Diocese and Father C. were to take, stated, "Permit me to note that failure to comply with these directives may very likely result in legal action against you and almost certainly in litigation involving the Diocese (its bishop) and its assets." (Notes of testimony, 3/7–8/94 at 301.)

¶ 35 After counseling, Father C. was transferred to a convent but continued to bring children to his sleeping quarters. Upon learning of his activities from the sisters at the convent, Bishop Hogan again wrote to Father C. on January 13, 1987, stating in pertinent part:

> I deem it prudent to send along a little precautionary suggestion. Especially when the attorneys are struggling energetically but concernedly with our legal realities. We're not yet out of the woods—and they beg for the cooperation of all involved.
>
> The problem? The [B.] family is nervous of your frequent visits. The [T.] girl considers herself harassed. Anonymous letters add to her annoyance and suspicion. The Johnstown young lady ... has made known ... her familiarity with our story....
>
> My suggestion? *For the time being, cool any and all association with youth.* You already know of the storm raised by the irate mother in Johnstown. Let's get the case settled first. Don't jeopardize it. For it could yet cause you and the Diocese a bit of heartache.

*Id.* at 107 (emphasis added).

¶ 36 On March 19, 1987, while Father C. was still at the convent, Bishop Hogan sent him another letter upon learning Father C. had not stopped his "youth involvement":

> I experienced a greater degree of genuine worry over the matter of youth involvement. Especially when trips to ... transport, the loaning of car to, the bringing of one or more [to] the convent for overnight—even in your room. You see [the sisters] know of my contrary stipulation—apparently you told them of it.
>
> ... If this youth involvement is discoverable, and how can it not be, there is extreme danger of courtroom disaster....
>
> [Lest] you think that I try to level a sand castle with battleship rifles, allow me to cite this: last week I learned that the Johnstown family, armed with professional reports, will seek damages. If a conference fails to resolve the issue, it will go into a court action—publicity and all. *No wonder I asked you to lie low,* or that I fear further compromising of the case and jeopardizing of the Diocese.
>
> *If there is to be any youth association for the time being—i.e. until the case is settled,* I shall want to know. For you will be immediately removed from your assignment. As long as you have a diocesan assignment, the responsibility is diocesan. *Apart, off on your own, so to speak, it is yours.* Moreover, there is to be no permitting of any

youthful people to visit the convent for any reason.

Father [C.], I am not happy with such bluntness. But I cannot afford not to be. Danger flags are up, for you, for me (*for 1979 may well not be out of the picture* ), for the Diocese.

*Id.* at 100–101 (emphasis added).

¶ 37 Despite Bishop Hogan's testimony that he knew by 1986 Father C. lied to him in 1979 and was a pedophile, these letters fail to mention any concern for the eight children Father C. was known to have molested by 1986, instead expressing concern with Father C.'s continuing molestation only if it occurred while Father C. had a Diocesan assignment. (*Id.* at 324–325.)

¶ 38 Bishop Hogan acknowledged receiving a letter from Monsignor Kiniry in which Monsignor Kiniry admitted he knew Father C. was molesting children as early as July of 1985 but did not bring the matter to Bishop Hogan's attention for six months. (*Id.* at 307.) The Bishop also testified that the Diocese offered no help or counseling to the boys beyond that which Monsignor Kiniry initiated on his own, if any, did not advise the parishioners whose children came into contact with Father C. to avoid him, and through the pastor, actually took up a collection to help Father C. with his "nervous problem." (*Id.* at 325–327.)

¶ 39 Probably the single most damaging evidence the jury heard came in the form of excerpts from Bishop Hogan's 1988 deposition, taken prior to the court order unsealing the Diocesan "secret archives." Bishop Hogan testified that, until the Hutchison/Luddy incident was brought to his attention in 1987, none of the situations brought to his attention during his tenure as Bishop involved pedophilia. (*Id.* at 36–37.) Specifically, in response to appellees' counsel's questioning regarding instances other than alcoholism that were serious

enough to require Bishop Hogan's intervention, the Bishop testified, "In general terms I will say none of them involved pedophilia." (*Id.* at 36.) As the Bishop testified in 1988, "Disciplinary measures—were called for in that two or three—I'd have to go back to do some recollecting here—instances that I thought were sufficient gravity to intervene." (*Id.* at 37.) When asked again, "But none of them dealt with pedophilia?" the Bishop responded, "None." (*Id.*)

¶ 40 From the evidence and letters set forth *supra,* the jury knew that Bishop Hogan's 1988 deposition testimony was not true, thereby giving the jury reason to question not only the credibility of the Bishop, but also the credibility of the other Diocesan parties, all of whom reported to the Bishop. *See Berger v. Schetman,* 883 A.2d 631, 640 (Pa.Super.2005) (observing that " '[t]he fact finder is free to believe all, part, or none of the evidence and the Superior Court will not disturb the credibility determinations of the court below' "), quoting *Nicholson v. Johnston,* 855 A.2d 97, 102 (Pa.Super.2004), *appeal denied,* 582 Pa. 665, 868 A.2d 453 (2005).

¶ 41 Turning next to Father Luddy, the *Hutchison III* panel has amply set forth evidence of Father Luddy's behavior with Michael, his brother Mark, and other boys, as well as Bishop Hogan's and the other Diocesan parties' acts or failures to act with regard to that behavior. *Hutchison III,* 763 A.2d at 839–840. We will therefore expand on that evidence only as it relates to the punitive damages claim.

¶ 42 As the *Hutchison III* panel observed, "Luddy was ordained as a priest of the Diocese in 1967 and did not leave until asked in May of 1987, following the allegations concerning this appeal. Hogan was the Bishop of the Diocese from July of

1966 until May 20, 1987, during Luddy's entire tenure." *Id.* at 839.

¶ 43 According to Luddy's testimony, Luddy's first molestation of a minor male occurred when Luddy was an associate pastor at St. Mark's Roman Catholic Church in Altoona, in approximately 1969. (*Id.;* notes of testimony, 2/2–4/94 at 2.) Luddy took the boy, who was 15, to Puerto Rico for eight days and also took the boy on three overnight trips to visit Luddy's sister, during which the boy and Luddy shared a bed at the Holiday Inn. (*Id.* at 17–23.) None of the abuse occurred at the rectory, however.

¶ 44 The second boy, who testified at trial, claimed he and a friend stayed at St. John's rectory one night after a trip to Johnstown with Luddy some time between 1967 and 1969. When the boy awoke, Father Luddy had his mouth on the boy's penis and told the boy he wanted to sodomize him. (Notes of testimony, 2/14/94 at 8–16.) The boy woke his friend and fled from the rectory. (*Id.*) The boy testified he told Father Mulvehill, the pastor at St. John's, exactly what had happened, and Father Mulvehill promised the boy his report would be "taken care of." (*Id.* at 16.) Luddy admitted his involvement with the boy but denied he attempted to sodomize him. Luddy also testified he last had contact with that boy in 1970, after he had been transferred to St. John's Cathedral in Johnstown for reasons unrelated to sexual activity. Father Mulvehill denied the boy's allegations. (Notes of testimony, 3/21–25/94 at 648–649.)

¶ 45 The third boy Luddy admitted he molested was approximately 14–15 years of age at the time. Luddy gave the boy alcohol and invited him to spend the night at the rectory. The molestation began in 1972 at the Cathedral of the Blessed Sacrament, where Monsignor Thomas Madden was pastor and Father Leonard Inman had a room on the same floor as Luddy. Luddy assumed both Monsignor Madden and Father Inman were in the rectory while he was molesting this boy. (Notes of testimony, 2/2–4/94 at 52–90.) Luddy continued to molest the boy after he was transferred to St. Therese's.

¶ 46 Prior his transfer:

> The evidence showed that Luddy had developed a problem with alcoholism beginning in 1968 and continuing until 1982. Monsignor Madden had observed problems with Luddy's behavior, e.g., tardiness, disappearances from the rectory until the wee hours of the morning, and driving problems involving possible hit and run activity. Monsignor Madden had attributed these problems, which he described as a failure to fulfill obligations, to a Peter Pan syndrome, meaning Luddy was immature. He [testified he] knew nothing of the pedophilic activity specifically. Monsignor Madden wrote to Bishop Hogan concerning Luddy's problems. Bishop Hogan responded by informing Luddy that his behavior was intolerable. Luddy promised to stop drinking and was transferred to St. Therese's.

*Hutchison III*, 763 A.2d at 839. In his letter to Bishop Hogan, Monsignor Madden also told the Bishop he suspected that a deeper malaise was causing Luddy to turn to alcohol. *Id.*

¶ 47 Monsignor Kline, who was pastor at St. Therese's during Luddy's tenure there, testified, however, that he knew nothing of Monsignor Madden's letter to Bishop Hogan until the trial in this case, although the Bishop told Monsignor Kline that Luddy had some problems having to do with his use of alcohol. (Notes of testimony, 3/21–25/94 at 879–880, 982–983.) Monsignor Kline also testified that due to his "compassion," he would give a priest who admitted molesting a child a second

chance before reporting the molestation to the Bishop, unless the molestation became a habit. (*Id.* at 969–973.)

¶ 48 As the *Hutchison III* court also observed, Monsignor Saylor testified he received a report that Luddy's predecessor at St. Therese's, Father T.C., had sexually molested a minor while Monsignor Kline was pastor. In that instance, the child's mother reported the incident, Monsignor Saylor went immediately to the Bishop, and the Bishop instructed Monsignor Saylor to send the priest for psychiatric counseling. *Hutchison III*, 763 A.2d at 839–840.[9] Monsignor Kline testified, however, that he had never been informed of this incident and had no knowledge of Father T.C.'s sexual activity with children prior to being asked about it at trial. (Notes of testimony, 3/21–25/94 at 952–954.) He also testified that he thought Luddy occupied the same rooms Father T.C. occupied while assigned to St. Therese's. (*Id.* at 954.)

¶ 49 Mark Hutchison, Michael's brother, was the fourth boy whom Luddy admitted molesting, beginning in approximately 1977 when Mark was eleven or twelve years old, and continuing for four years, until 1980. Luddy admitted he molested Mark at least once a week or once every other week at the rectory during the four years, and also molested him on trips to Spain and France, for which Luddy paid. (Notes of testimony, 2/2–4/94 at 113–140.) Mark testified Luddy molested him over 300 times, approximately 200 times of which occurred in St. Therese's Rectory. (Notes of testimony, 2/14–18/94 at 62.)[10]

¶ 50 Monsignor Kline was aware that Luddy would take the Hutchison brothers to his rooms at the rectory to watch television, although he testified he thought their mother was with them 90 percent of the time. (Notes of testimony, 3/21–25/94 at 945, 1022.) Monsignor Kline admitted that he should have known, through his own observations and suspicions, that Luddy was engaged in sexual activity with minor males, based on the frequency of the Hutchison boys' visits to Luddy's private quarters. (Notes of testimony, 3/29–31/94 at 47.)

¶ 51 In 1980, Mark reported Luddy's abuse to Father Gabriel Zeis, a Franciscan priest who is not with the Diocese; and between 1981 and 1983, Mark informed Father Bernard Gratten, a priest in the Diocese, of his sexual relationship with Luddy. Mark testified Father Zeis, who met with Mark and his mother, assured them he would contact Bishop Hogan and that the church could provide help to Luddy. (Notes of testimony, 2/14–18/94 at 49–58.)

¶ 52 As the trial court observed in its opinion denying the Diocesan parties' post-trial motions, "Church Defendants argue their evidence and/or interpretation of Plaintiff's evidence as if it was the only evidence and/or interpretation available to the jury." (Trial court opinion, 3/14/95 at 83.) With regard to Bishop Hogan's and Monsignor Kline's testimony, the trial court observed, "These witnesses simply were not believed by this jury. Nothing could be clearer." (*Id.*) Continuing, the trial court opined that the jury "clearly believed both the diocese (through Monsi-

---

9. Father T.C. remained a priest in the Diocese until his death approximately three years prior to trial, however. (Notes of testimony, 3/14–18/94 at 806.)

10. *Michael testified Luddy molested him 50 to 75 times in the church rectory.* (Notes of testimony, 2/18/94 at 73.) Michael also testified he saw Monsignor Kline in a downstairs doorway on one occasion when Michael and Luddy were on their way to Luddy's private quarters. (*Id.* at 56–59.)

gnor Kline at a minimum) and Bishop Hogan had both notice and knowledge. Further, that they/he avoided their responsibility." (*Id.* at 84.)

¶ 53 Viewing the evidence set forth *supra* in the light most favorable to Michael as verdict winner, as we must, we find the record supports the jury's finding the Diocese subjectively appreciated the risk of harm of pedophilia long before Father Luddy molested Michael, yet acted, or failed to act, in conscious disregard of the risk despite knowing or having reason to know priests within the Diocese were molesting its children. In particular, the jury could have properly found outrageous the Diocesan parties' failure to investigate and discipline its priests, including Father Luddy, for acts of molestation occurring as early as 1967, in conscious disregard of the rights of Michael and his family, who placed their trust and unwavering loyalty in the Diocesan parties.

¶ 54 We find the evidence before the jury in this case far more egregious than the facts our supreme court has previously confronted when finding the evidence did not support a punitive damages verdict. Even in *Martin, supra,* in which the defendants were aware asbestos could cause illness among employees at an asbestos manufacturing plant, the defendants did not have knowledge that asbestos insulation installers faced the same risk. *Martin, supra* at 174–175, 494 A.2d at 1099. Of even more significance, the defendants in *Martin* most assuredly did not know that specific insulation installers had developed asbestos-related diseases and did not have pleas from them or their families to stop using asbestos-containing products. Only such a fact pattern could closely parallel the evidence before the jury in this case. As the *Martin* court opined, "On this appeal Martin has not argued that the appellants appreciated the risk of asbestos

insulation installers face and, nevertheless, acted or failed to act in flagrant disregard of their safety." *Id.* at 176, 494 A.2d at 1100.

■ ¶ 55 Having found the evidence supported the jury's punitive damages award, we next address the Diocesan parties' claim that we must remand for a new trial as to the amount of that award. (Appellants' substituted brief on remand at 15.) According to the Diocesan parties, by vacating the jury's verdict against St. Therese's, our supreme court has left unresolved the amount of the $1,000,000 in punitive damages for which the Diocesan parties other than St. Therese's are responsible.

¶ 56 We find no merit to this issue for numerous reasons. First, the Diocesan parties have not indicated that they objected to the trial court's inclusion of St. Therese's with Bishop Hogan and the Diocese in jury interrogatory number 12, either before or after the judge gave the interrogatory to the jury. That interrogatory reads:

12. If you have answered yes to questions Number 3 and 4, or 5 and 6, or 7 and 8, do you further find that the Defendants, Bishop Hogan, St. Therese's Catholic Church, and/or the Diocese of Altoona–Johnstown's conduct was outrageous? (In that the Defendants acted with reckless indifference to the interest of Plaintiff, Michael S. Hutchison, Jr.)

Jury verdict slip, 4/21/94 at 4. In fact, the Diocesan parties' proposed verdict form framed the punitive damages questions with regard to all of the defendants except Father Luddy as follows:

7. Do you find that there has been any evidence that the conduct of the defendants, St. Therese's Catholic Church, St. Therese's Elementary School, Bishop James Hogan and

the Diocese of the [sic] Altoona–Johnstown, was outrageous, wanton and in total disregard of the rights of the plaintiff? Yes___ No___

. . . .

9. If you have answered question # 7 "yes", please enter the amount of punitive damages, if any, to be awarded to the plaintiff, Michael S. Hutchison, Jr. against the Diocesan Defendants. $_____.

Diocesan Parties' Proposed Verdict Form, 4/22/94, R. at 330 p. 3, R.R. at 218.

¶ 57 Additionally, on remand, our supreme court asked us to consider one narrow issue: "whether the jury's award of punitive damages *against the Diocesan Parties* was properly supported by the evidence." *Hutchison IV, supra* at 126, 870 A.2d at 773 (emphasis added). That court did not instruct us to remand for retrial of the punitive damages award if we found the evidence supported the award.

¶ 58 Finally, St. Therese's liability for punitive damages was joint and several with the Diocesan parties' and was predicated on the practice of ignoring complaints and flagrant evidence of priest pedophilia altogether, of transferring priests who admitted molesting children without warning anyone at the new parish, and of failing to offer any help to the numerous victims these priests molested. These were not the practices of St. Therese's; rather, they were the practices of the Diocesan parties, particularly Bishop Hogan and including Monsignor Kline while he was pastor at St. Therese's. During his tenure, both Father T.C. and Father Luddy sexually molested minors for years while Monsignor Kline was under the same roof. Monsignor Kline's abysmal disregard for the safety of the Hutchison brothers and other minors prior to the incidents underlying this case led directly to Luddy's opportunity to molest Michael. As the trial court observed:

> As we have opined throughout and truly believe, affirmative answers to the first eight questions on the verdict slip in our judgment demanded an award of punitive damages. We cannot envision a situation much more outrageous or detrimental to the advancement of a civilized society than what the jury had concluded occurred by their responses to the first eight questions.

Trial court opinion, 3/14/95 at 168. We therefore find no merit to the Diocesan parties' claim they are entitled to a new trial as to the amount of punitive damages for which they should be held liable.

¶ 59 We affirm the trial court's entry of judgment in favor of Michael in the amount of $1 million in punitive damages. Jurisdiction is relinquished.