Laila SNEAD, Appellant

v.

SOCIETY FOR the PREVENTION OF CRUELTY TO ANIMALS OF PENNSYLVANIA.

Laila Snead

v.

Society for the Prevention of Cruelty to Animals of Pennsylvania, Appellant.

Superior Court of Pennsylvania.

Argued Oct. 3, 2006.

Filed July 11, 2007.

Reargument Denied Sept. 13, 2007.

Glen H. Ridenour II, Philadelphia, for Snead.

Walter Phillips, Jr., Asst. Dist. Atty., Philadelphia, for Com.

BEFORE: FORD ELLIOTT, P.J., BOWES, J. and McEWEN, P.J.E.

OPINION BY FORD ELLIOTT, P.J.:

¶ 1 This matter involves cross-appeals following a jury trial in which defendant, Society for the Prevention of Cruelty to Animals of Pennsylvania ("SPCA"), was found liable for euthanizing the dogs belonging to plaintiff, Laila Snead ("Snead").

The jury awarded Snead $154,926.37, including $100,000 in punitive damages. We affirm the judgment in part, reverse in part, and remand for further proceedings.

¶ 2 The procedural history of this case is somewhat complicated and the facts involving the condition of the dogs at the heart of this case are very disturbing. Although we will repeat several times *infra* that under Pennsylvania law, the animals are considered property, this court clearly recognizes that dogs as pets hold a unique place in many people's lives as friend, companion, and family member.

¶ 3 The facts leading to the lawsuit, to be discussed in greater detail *infra* when addressing SPCA's specific claims on appeal, are generally as follows. On January 23, 1999, Humane Society Officer Felix Anthony Beltram ("Officer Beltram") responded to a complaint regarding a dead dog inside 713 East Hilton Street, Philadelphia. (Notes of testimony, 7/6/05 at 202–203.) When he arrived, he discovered 13 dogs, 1 dead and 12 alive. (*Id.* at 150.) The dogs were all pit bull terriers, with the exception of "Aramis," a Beauceron.[1] (Notes of testimony, 7/7/05 at 35.) Officer Beltram testified that the house appeared to be abandoned and was in poor condition. (Notes of testimony, 7/6/05 at 205.) Several of the dogs had suffered wounds and appeared to be emaciated. (*Id.* at 216–220.)

¶ 4 While the animals were in the process of being removed from the home, Snead arrived. (*Id.* at 148–149.) Snead told Officer Beltram that she lived at the home and that the animals were hers. (*Id.* at 150, 169.) Officer Beltram placed Snead under arrest for dog-fighting[2] and

---

1. A Beauceron is a French breed of shepherd. (Notes of testimony, 7/7/05 at 160.)

2. 18 Pa.C.S.A. § 5511 provides, in relevant part:

(h.1) **Animal fighting.**—A person commits a felony of the third degree if he:

(1) for amusement or gain, causes, allows or permits any animal to engage in animal fighting;

informed her that her dogs would be held as evidence pending resolution of the charges.[3] (*Id.* at 150–151; 7/7/05 at 65–67.)

¶ 5 The following day, January 24, 1999, the district attorney dropped the dog-fighting charges; however, Snead was not aware that the charges were dropped and that the dogs were therefore available to be reclaimed.[4] On January 27, 1999, Snead went to the shelter to check on the dogs; she spoke with Charles Spencer ("Spencer"), the director of animal care, who informed Snead that all of the dogs had been euthanized. (Notes of testimony, 7/6/05 at 59; 7/7/05 at 69–70.) Snead was told that the shelter is only required to keep animals for 48 hours; and since the charges were dropped and the dogs were no longer needed as evidence, they were put to sleep. (Notes of testimony, 7/7/05 at 69–70, 193–194.) Snead became hysterical and left the shelter. (*Id.* at 70, 192.) In fact, the dogs were not euthanized until January 30, 1999, three days later. (Notes of testimony, 7/6/05 at 197.) Snead testified that had she been provided notice that the dogs were available to be redeemed, she would have taken them back and com-

plied with any SPCA conditions. (Notes of testimony, 7/7/05 at 70–71.) Snead also testified that several of the dogs were strays that she had taken in with the intention of nursing them back to health. (*Id.* at 42–43.)

¶ 6 Snead initially filed suit in municipal court in 2001, contending that SPCA illegally destroyed her dogs. Snead sought judgment for $8,450, the alleged value of the dogs. The municipal court granted judgment in favor of Snead on March 5, 2001, and SPCA appealed on March 22, 2001. The appeal was listed for a trial *de novo* in the court of common pleas; and on June 19, 2001, Snead filed a civil complaint, alleging trespass, conversion, negligence, and violations of 42 U.S.C.A. § 1983. The case was transferred to compulsory arbitration; and on January 15, 2003, the arbitrators entered their report finding in Snead's favor on all counts. SPCA filed an appeal from the arbitrators' award on February 10, 2003.

¶ 7 The case proceeded to a jury trial on October 22, 2003, at the conclusion of which SPCA made an oral motion for a directed verdict. The trial court granted the motion by order entered October 30,

---

(2) receives compensation for the admission of another person to any place kept or used for animal fighting;

(3) owns, possesses, keeps, trains, promotes, purchases or knowingly sells any animal for animal fighting;

(4) in any way knowingly encourages, aids or assists therein;

(5) wagers on the outcome of an animal fight;

(6) pays for admission to an animal fight or attends an animal fight as a spectator; or

(7) knowingly permits any place under his control or possession to be kept or used for animal fighting.

This subsection shall not apply to activity undertaken in a normal agricultural operation.

3. Authorized by § 5511(j), which provides in part:

(j) **Seizure of animals kept or used for animal fighting.**—Any police officer or agent of a society or association for the prevention of cruelty to animals incorporated under the laws of this Commonwealth, shall have power to seize any animal kept, used, or intended to be used for animal fighting. When the seizure is made, the animal or animals so seized shall not be deemed absolutely forfeited, but shall be held by the officer or agent seizing the same until a conviction of some person is first obtained for a violation of subsection (h.1).

4. Snead was later convicted of the summary offense of animal cruelty, 18 Pa.C.S.A. § 5511(c).

2003. Snead filed post-trial motions arguing, *inter alia,* that the trial court erred by granting SPCA's motion for directed verdict because Snead had presented sufficient evidence to prove each count raised in her complaint. Snead's post-trial motions were denied; and on February 3, 2004, Snead filed notice of appeal with this court.

¶ 8 On appeal, a unanimous panel of this court held that Snead could not sustain a Section 1983 claim for violation of her Fourth Amendment right to privacy based on the warrantless search and seizure of the dogs. *Snead v. Society for the Prevention of Cruelty to Animals of Pennsylvania* ("*Snead I*"), No. 402 EDA 2004, unpublished memorandum, 873 A.2d 778 (Pa.Super. filed February 1, 2005). It appearing from the uncontroverted evidence that the house at 713 East Hilton Street was abandoned and that Snead was not actually sleeping in the structure in January 1999, we found that Snead had no legitimate expectation of privacy and her claims of trespass and the violation of her civil rights, based on her Fourth Amendment right to privacy in the structure, failed as a matter of law. *Id.* at 10–14. However, with regard to Snead's remaining claims for negligence, conversion, and Section 1983 claims, we remanded for a new trial. We determined that the trial court had improperly weighed conflicting evidence to rule on SPCA's motion for directed verdict with respect to these claims, including Snead's testimony that she had attempted to retrieve the dogs on January 27 only to be told they were already dead, testimony which was contra-

dicted by Spencer. *Id.* at 14. The weighing of this testimony involved credibility determinations which were for the jury. *Id.* at 14–15.[5]

¶ 9 On July 6, 2005, a second jury trial commenced, following which the jury rendered the verdict described above. SPCA's post-trial motions were denied. Snead's post-trial motion for delay damages in the amount of $1,544.50 was granted; however, her post-trial motion for counsel fees was denied. Both parties filed timely notices of appeal[6] and have complied with the trial court's order directing them to file concise statements of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). On February 1, 2006, the Honorable Edward E. Russell filed opinions addressing the issues raised in both appeals.

¶ 10 We will address SPCA's claims first. SPCA has raised the following issues for this court's review:

1. Because the Legislature, when it charged the SPCA with police power to prevent cruelty to animals, intended to vest the SPCA with immunity from common law causes of action, did the trial court err when it refused to dismiss Snead's conversion and negligence claims?

2. Because the trial evidence was legally insufficient to support the jury's findings that the SPCA violated Snead's civil rights under 42 U.S.C. § 1983, that the SPCA was negligent, and that the SPCA was liable for conversion in its handling of Snead's dogs-and indeed, where the

---

5. This court also addressed several evidentiary issues raised in Snead's post-trial motions, such as evidence introduced at the first trial that Snead had been involved with pit bull dog-fighting activities. This court determined this evidence too prejudicial to be introduced at retrial. *Id.* at 15–19.

6. SPCA initially filed its appeal December 9, 2005 in Commonwealth Court. On January 24, 2006, the appeal was transferred to Superior Court.

evidence proved: (1) at most, that the SPCA may have inaccurately represented the status of eleven (11) dogs that had been euthanized; and (2) overwhelmingly, that the near-death condition of the animals resulted from them being under the custody and 'care' of Snead-did the trial court err when it denied the SPCA's Motion for Post–Trial Relief?

3. Because there was no evidence that the SPCA was reckless, had evil intent, or demonstrated callous indifference in its handling of Snead's dogs, and because the punitive damages award was unconstitutionally excessive and a violation of due process, did the trial court err by upholding the jury's $100,000 punitive damages award?

SPCA's brief at 3.[7]

■ ¶ 11 First, SPCA argues that Snead's common law claims for conversion and negligence are barred by the doctrine of sovereign immunity and the Political Subdivision Tort Claims Act. SPCA argues it is a Commonwealth party and/or local agency entitled to immunity. We disagree.[8]

■ ¶ 12 The defense of sovereign immunity is available to a Commonwealth party, which is defined as "a Commonwealth agency and any employee thereof." 42 Pa.C.S.A. § 8501. "Commonwealth agency" means any executive agency or independent agency. 42 Pa.C.S.A. § 102; Standard Pa. Practice 2d § 114:27. "Ex-

ecutive agency" is defined as "The Governor and the departments, boards, commissions, authorities and other officers and agencies of the Commonwealth government, but the term does not include any court or other officer or agency of the unified judicial system, the General Assembly and its officers and agencies, or any independent agency." *Id.* In turn, "independent agency" is defined as

> Boards, commissions, authorities and other agencies and officers of the Commonwealth government which are not subject to the policy supervision and control of the Governor, but the term does not include any court or other officer or agency of the unified judicial system or the General Assembly and its officers and agencies. For purposes of jurisdiction of courts the term includes the Pennsylvania Deposit Insurance Corporation existing under the act of October 5, 1978 (P.L. 1088, No. 255), known as the 'Pennsylvania Deposit Insurance Corporation Act.'

*Id.* (footnote omitted).

> [T]he sovereign immunity provisions of the Judicial Code were enacted to insulate the Commonwealth and its agencies from liability except in certain specified circumstances so that state governmental assets are not subject to depletion through multiple lawsuits. *See Jones v. Southeastern Pennsylvania Transp. Auth.,* 565 Pa. 211, 772 A.2d 435, 438–40 (2001). Thus, in determining whether an entity is a Commonwealth agency for

---

7. Additional claims raised in SPCA's 1925(b) statement, including whether the trial court erred in granting Snead's motion *in limine* to exclude evidence of her summary conviction for animal cruelty, have been abandoned on appeal.

8. We note that in granting Snead's motion to transfer to this court, Commonwealth Court apparently determined that SPCA was not a Commonwealth party for jurisdictional purposes. However, an entity may be a Commonwealth party for sovereign immunity purposes but not for jurisdictional purposes. *James J. Gory Mechanical Contracting, Inc. v. Philadelphia Housing Authority,* 579 Pa. 26, 855 A.2d 669 (2004).

sovereign immunity purposes, the important factors to be considered are whether the entity was created by the state to perform a state function so that a judgment against it would, in essence, injure the state.

*James J. Gory Mechanical Contracting, Inc. v. Philadelphia Housing Authority,* 579 Pa. 26, 39, 855 A.2d 669, 677 (2004) (footnote omitted).

¶ 13 It is apparent from the record that SPCA is a private, not-for-profit corporation, not a "Commonwealth agency." Its officers and directors are not appointed by the Commonwealth, but rather elected by the corporation. The Commonwealth does not have control over its operations or assets. SPCA adopts its own by-laws and manages its own affairs. SPCA is not funded by public monies. SPCA has not been recognized by our legislature as an "agent" or "instrumentality" of the Commonwealth.[9] Although SPCA and its qualified agents have been empowered to enforce those statutes pertaining to animals, this does not make SPCA a "Commonwealth agency" for immunity purposes. We determine, as a matter of law, that sovereign immunity does not apply to SPCA.

 ¶ 14 SPCA also argues that the Political Subdivision Tort Claims Act insulates it from liability for Snead's common law tort claims. Again, we disagree.[10]

¶ 15 The Pennsylvania Political Subdivision Tort Claims Act, Section 8541, 42

Pa.C.S.A., provides, "Except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person."

The overall purpose of the Tort Claims Act, of course, is to limit governmental exposure to tort liability for its acts. *See, e.g., Lory v. City of Philadelphia,* 544 Pa. 38, 43, 674 A.2d 673, 675–76 (1996), *cert. denied,* 519 U.S. 870, 117 S.Ct. 184, 136 L.Ed.2d 123 (1996). *See also Smith v. City of Philadelphia,* 512 Pa. 129, 139, 516 A.2d 306, 311 (1986) (plurality opinion) ('preservation of the public treasury as against the possibility of unusually large recoveries in tort cases, is, self-evidently, an important governmental interest').

*Sphere Drake Insurance Co. v. Philadelphia Gas Works,* 566 Pa. 541, 548, 782 A.2d 510, 515 (2001).

Our inquiry begins with an examination of the plain language of the relevant statutory provisions. *See* 1 Pa.C.S. §§ 1903(a), 1921(b); *Commonwealth v. Burnsworth,* 543 Pa. 18, 24, 669 A.2d 883, 886 (1995) (when language of statute is clear and unambiguous, it must be given effect in accordance with its plain and common meaning); *Guinn v. Alburtis Fire Co.,* 531 Pa. 500, 502–03, 614 A.2d 218, 220 (1992) (the object of all interpretation and construction of statutes is to ascertain and effectuate the

---

9. SPCA argues it is a Commonwealth entity because it was created by act of assembly in 1868. Act of 1868, P.L. 615. However, as Snead states, it was common at that time for Pennsylvania corporations to be formed under provisions of special acts of the legislature, and nothing in the Act of 1868 suggests that SPCA was intended to be a Commonwealth agency. (Snead's brief at 13.)

10. We note that this argument was not raised in the court below, nor in SPCA's Rule 1925(b) statement. However, a defense of governmental immunity is an absolute defense and is non-waivable; it may be raised at any time, even at the appellate stage. *Taylor v. City of Philadelphia,* 692 A.2d 308, 313 (Pa.Cmwlth.1997), *affirmed,* 548 Pa. 568, 699 A.2d 730 (1997) (footnote and citations omitted).

intention of the General Assembly; the best indicator of legislative intent is the plain language of the statute). The Tort Claims Act comprises Subchapter C of Chapter 85 of the Judicial Code, the chapter which addresses 'Matters Affecting Government Units.' The definition section of Chapter 85 defines a 'local agency' as '[a] government unit other than the Commonwealth government.' 42 Pa.C.S. § 8501. The general definitions section of the Judicial Code, which applies in the absence of further specific definitions, defines a 'government unit' as, *inter alia*, ' "any government agency. . . .' *Id.* § 102. A 'government agency,' in turn, is defined by the Judicial Code as '[a]ny Commonwealth agency or any political subdivision or municipal or other local authority, or any officer or agency of any such political subdivision or local authority.' *Id.* (emphasis supplied). *See also Guinn,* 531 Pa. at 502 n. 2, 614 A.2d at 220 n. 2.

Although the Judicial Code does not define 'local authority,' the Statutory Construction Act does. It provides that the phrase 'local authority,' '[w]hen used in any statute finally enacted on or after January 1, 1975,' means 'a municipal authority or any other body corporate and politic created by one or more political subdivisions pursuant to statute.' 1 Pa.C.S. § 1991. Both the Judicial Code and the Tort Claims Act were enacted after January 1, 1975; hence, both are subject to this overarching definition.

*Id.* at 545–546, 782 A.2d at 513 (citation omitted).

¶ 16 In determining that SPCA is not a government agency, the trial court stated:

In the instant case, [SPCA's] directors and officers are not appointed by the Commonwealth, but rather, elected by the corporation. The Commonwealth does not exercise control over its operations or have an interest in its assets. [SPCA] adopts its own by-laws and manages its own affairs. The Commonwealth is not its sole source of income, nor does it provide benefits or indemnity. Under the expanded inquiry set forth in *Sphere Drake, supra,* [SPCA] does not qualify as a Commonwealth party or employee.

Trial court opinion, 2/1/06 at 7. We agree and will not disturb the trial court's determination. *See Tabaj v. Fayette Society for the Prevention of Cruelty to Animals Inc.,* 53 Pa.D. & C.4th 399 (Fayette 2001), *affirmed,* 828 A.2d 409 (Pa.Super.2003), *appeal denied,* 575 Pa. 698, 836 A.2d 123 (2003) (Fayette County SPCA not entitled to local agency immunity under the Tort Claims Act). *Compare Vonstein v. SPCA,* 24 Pa.D. & C.4th 474 (Lycoming 1993) (SPCA agents, while statutorily authorized to initiate criminal proceedings, not entitled to official immunity from suit).

¶ 17 Having found that SPCA is not immune from liability, we proceed to its remaining claims. SPCA argues that the evidence was insufficient, as a matter of law, to sustain Snead's claims. We disagree.

■ ¶ 18 First, we examine Snead's Section 1983 civil rights claims.

Section 1983 provides in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit

in equity, or other proper proceeding for redress.

42 U.S.C.A. § 1983. The statute ' "is not itself a source of substantive rights,' but merely provides 'a method of vindicating federal rights elsewhere con- ferred." ' *Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting *Baker v. McCollan,* 443 U.S. 137, 144, n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)).

*Wagner v. Waitlevertch,* 774 A.2d 1247, 1251 (Pa.Super.2001).

To properly state a Section 1983 claim, a plaintiff must allege a deprivation of a right guaranteed by the Constitution or the laws of the United States by a de- fendant acting under color of law. *Tun- stall v. Office of Judicial Support of Court of Common Pleas,* 820 F.2d 631, 633 (3d Cir.1987) (citing *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978)). There are two essential elements neces- sary to state a claim under 42 U.S.C.A. § 1983:(1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the Plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Johnson v. Desmond,* 441

Pa.Super. 632, 658 A.2d 375 (1995), *ap- peal denied,* 543 Pa. 713, 672 A.2d 308 (1995).

*Id.*

■ The first step in evaluating a Sec- tion 1983 claim is to 'identify the exact contours of the underlying right said to have been violated' and to determine 'whether the plaintiff has alleged a depri- vation of a constitutional right at all.' *County of Sacramento v. Lewis,* 523 U.S. 833, 842, n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

*Id.*

■ ¶ 19 Here, Snead's Section 1983 claims are grounded in the Fourth and Fourteenth Amendments to the Unit- ed States Constitution.[11] Snead claims that SPCA's euthanizing of the dogs con- stituted an unreasonable "seizure" in viola- tion of her Fourth Amendment rights; and, additionally, that she was deprived of due process under the Fourteenth Amend- ment. It is conceded that SPCA was act- ing under color of state law [12] when it took possession of and euthanized Snead's dogs; therefore, the first prerequisite for making out a Section 1983 claim is satisfied. (Tri- al court opinion, 2/1/06 at 3, 5; notes of testimony, 7/11/05 at 84.)

---

**11.** SPCA argues that, in the prior appeal, this court held against Snead on her Fourth Amendment claim. However, a close reading of our prior memorandum reveals we held only that Snead had no legitimate privacy interest in the house at 713 East Hilton Street, as the uncontested evidence indicated it was abandoned. Therefore, as she had no legitimate expectation of privacy in the struc- ture, she could not maintain a Fourth Amend- ment claim for Officer Beltram's warrantless search of the property. *Snead I, supra* at 14. This is a separate question from whether or not the subsequent killing of Snead's dogs constituted an unreasonable seizure.

**12.** We note that a defendant can be acting under color of state law for Section 1983 purposes, as SPCA was when it seized and then euthanized Snead's dogs, and yet not be a government party or entity for jurisdictional or immunity purposes. Although the color of law requirement necessarily excludes all merely private conduct, no matter how wrongful or discriminatory, there is no simple formula for defining state action, and Section 1983 includes within its scope superficially private actions which have a sufficiently close nexus with the State as to be fairly treated as those of the State itself. *Rossignol v. Voorh- aar,* 316 F.3d 516, 523 (4th Cir.2003), *cert. denied,* 540 U.S. 822, 124 S.Ct. 135, 157 L.Ed.2d 41 (2003) (citations omitted).

A seizure of property occurs when there is some meaningful interference with an individual's possessory interest in that property. *See Soldal v. Cook County,* 506 U.S. 56, 61–65, 113 S.Ct. 538, 543, 121 L.Ed.2d 450 (1992). A seizure of property sufficient to implicate Fourth Amendment rights occurs where the seizure is unreasonable. *Id.* In determining whether a government seizure violates the Fourth Amendment, the seizure must be scrutinized for its overall reasonableness. *Id.*

*Wagner, supra* at 1254. The killing of Snead's dogs is a seizure within the meaning of the Fourth Amendment. *Van Patten v. City of Binghamton,* 137 F.Supp.2d 98, 107 (N.D.N.Y.2001) (citation omitted). However, a seizure alone does not constitute a Fourth Amendment violation; the question is whether this seizure was reasonable under the circumstances. *Id.,* citing *Soldal, supra,* 506 U.S. at 61–62, 113 S.Ct. 538.

■ ¶ 20 Instantly, there was sufficient evidence for the jury to find the killing of Snead's dogs to be unreasonable, particularly where there was testimony that she had been to the shelter three days prior and erroneously informed that her dogs were already dead. As of January 27, the felony dog-fighting charges against her had been dropped and she was free to redeem the dogs. (Notes of testimony, 7/6/05 at 154–155.) Obviously, having been told the dogs were dead, Snead never returned to the shelter to reclaim them. Although Snead's account was contradicted by Spencer, who testified that he never spoke with Snead on January 27 (*id.* at 116), such conflicts in testimony go to the credibility of the witnesses which is a matter within the exclusive purview of the jury.[13]

■ ¶ 21 Next, we turn to Snead's due process claim. To prevail on her procedural due process claim, Snead must demonstrate: (1) that she possessed a protected property interest; and (2) that she was deprived of that interest without due process. *Van Patten, supra* at 104 (citation omitted). Pennsylvania law considers dogs to be personal property. *Desanctis v. Pritchard,* 803 A.2d 230, 232 (Pa.Super.2002), *appeal denied,* 572 Pa. 757, 818 A.2d 504 (2003), citing 3 P.S. § 459–601(a); *Price v. Brown,* 545 Pa. 216, 224, 680 A.2d 1149, 1153 n. 3 (1996). Therefore, we find Snead did have a protected property interest in her dogs.

■ ¶ 22 We must next determine to what amount of legal process she was entitled.

In determining what process is due, a court must balance three factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Van Patten, supra* at 104 (citations and internal quotation marks omitted).

■ ¶ 23 As in *Van Patten,* we find that Snead had a significant property interest in her dogs. As stated *supra,* Pennsylvania law considers dogs as property. In addition, although there was evidence

---

**13.** SPCA argues that as a "government unit," Snead would have to show that its employees/agents were acting pursuant to an official policy or custom. (SPCA's brief at 25.) However, we have already determined for the reasons discussed *supra* that SPCA is not a government party.

the animals were unhealthy and suffered from neglect, Snead testified at length concerning her love and devotion to the animals and her efforts to nurse them back to health, and we must credit this testimony as the jury apparently did.

¶ 24 Next, we turn to the procedures used by SPCA. Spencer testified that the dogs were initially being held as evidence in an ongoing investigation. (Notes of testimony, 7/6/05 at 64.) Subsequently, the charges were dropped and there was no longer a hold on the animals. At that point, depending on the circumstances, if the owner's identity was known, the animals would be returned; however, Spencer testified there was "no hard-clad policy as such." (*Id.* at 82.) When asked whether he took any steps to ensure Snead was notified that her animals were available to be returned, Spencer stated that it was not his responsibility and that the decision had already been made, although he was aware that Officer Beltram had been to 713 East Hilton Street and nobody was home. (*Id.* at 83–85.)

¶ 25 Spencer testified that any safeguards in place to notify an owner that his or her animals are available to be redeemed are through the investigative department. (*Id.* at 93.) He knew Officer Beltram's attempt to contact Snead by going back to the house was unsuccessful; however, it was not his department. (*Id.* at 95.) He was aware of when the dogs were put to sleep, since he, Officer Beltram, and the veterinarian would have had to give their approval. (*Id.* at 74–75, 83.)

¶ 26 Officer Beltram testified that SPCA policy is for dogs no longer being held as evidence in a criminal case to be treated as strays. (*Id.* at 165.) If unlicensed, as these dogs apparently were,[14] they only need to be held another 48 hours before a decision will be made. (*Id.*) If licensed, they will be held 10 days, and a certified letter is sent to the owner notifying her to reclaim her animals. (*Id.* at 165–166.)

¶ 27 Officer Beltram testified that although he is employed by SPCA, SPCA and Humane Society officers have separate and distinct functions. (*Id.* at 157–158.) The Humane Society officers work under the auspices of the state and enforce the state animal laws, while SPCA simply houses and shelters animals. (*Id.*) Officer Beltram testified that SPCA had no policy in place to notify an owner that charges had been dropped and she was permitted to redeem her animals. (*Id.* at 155–156.) However, as a Humane Society officer, he is supposed to visit the owner's home to see whether she is there. (*Id.* at 157.)

¶ 28 In the afternoon of January 27th or 28th, Officer Beltram went to Snead's home at 713 East Hilton Street. (*Id.* at 162–163.) Nobody was present and the house still appeared to be abandoned. (*Id.* at 162.) Officer Beltram did not leave a note or anything on the door. (*Id.*) No notice by mail was ever sent to Snead. (*Id.* at 172.) No attempt was made to telephone her, although SPCA had her telephone number in their computer because she had redeemed animals from them in the recent past. (*Id.* at 172, 175–176.)

¶ 29 The foregoing was sufficient evidence for the jury to find that SPCA had inadequate procedures/policies in place to safeguard Snead's property interests in the dogs. Although unlicensed dogs are

14. There is some confusion on this point. There was testimony that Snead had been to the SPCA shelter on January 20, 1999, prior to the incident that precipitated the instant lawsuit, when she redeemed animals from SPCA and paid a licensing fee. (Notes of testimony, 7/6/05 at 99, 103.) Indeed, Spencer testified that he had contact with Snead regarding her animals on several occasions prior to this incident. (*Id.* at 97.)

only held for 48 hours after they are no longer needed as evidence in a criminal investigation, there is no standard procedure by which to notify an owner that charges have been dismissed or withdrawn and his or her dogs are available to be reclaimed. Although Snead was known to SPCA and her phone number was in its computer, she was never contacted by telephone, nor was notice sent by mail.

¶ 30 As in *Van Patten,* we recognize SPCA's interest in protecting the public from dangerous or sick animals, and the costs involved in housing animals for extended periods of time. *Van Patten, supra* at 107. However, additional safeguards such as notice by mail or telephoning the owner, where her identity and address/phone number are known or ascertainable, would not be overly burdensome or costly.

■ ¶ 31 Next, SPCA challenges the sufficiency of the evidence to sustain Snead's negligence and conversion claims.

To establish a cause of action sounding in negligence, a party must demonstrate they were owed a duty of care by the defendant, the defendant breached this duty, and this breach resulted in injury and actual loss. *Brisbine v. Outside In Sch. of Experiential Educ., Inc.,* 799 A.2d 89, 93 (Pa.Super.2002), citing *Brezenski v. World Truck Transfer,* 755 A.2d 36, 40 (Pa.Super.2000).

*McCandless v. Edwards,* 908 A.2d 900, 903 (Pa.Super.2006).

[T]he determination of whether an act or failure to act constitutes negligence, of any degree, in view of all the evidence has always been particularly committed to determination by a jury. *Colloi v. Philadelphia Electric Co.,* 332 Pa.Super. 284, 481 A.2d 616 (1984); *East Texas Motor Freight v. Lloyd,* 335 Pa.Super. 464, 484 A.2d 797 (1984). It is an issue that may be removed from consideration by a jury and decided as a matter of law only where the case is entirely free from doubt and there is no possibility that a reasonable jury could find negligence. *Id.*

*Bloom v. Dubois Regional Medical Center,* 409 Pa.Super. 83, 597 A.2d 671, 679–680 (1991).

■ ¶ 32 All three elements to prove negligence have been met. When Snead's dogs were seized, they were to be held as evidence in a criminal investigation. SPCA had a duty to notify Snead when the dog-fighting charges were dropped and her animals were available to be redeemed. Obviously, it breached that duty when it failed to notify Snead to redeem her dogs and, in fact, misrepresented that they had already been euthanized on January 27, 1999 when she came to see them. Finally, Snead proved actual damages by presenting expert testimony concerning the value of the dogs. (Notes of testimony, 7/7/05 at 153–188.)

■ ¶ 33 We now address Snead's conversion claim.

The classic definition of conversion under Pennsylvania law is 'the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification.' *McKeeman v. Corestates Bank, N.A.,* 751 A.2d 655, 659 n. 3 (Pa.Super.2000). Although the exercise of control over the chattel must be intentional, the tort of conversion does not rest on proof of specific intent to commit a wrong. *Id.*

*L.B. Foster Co. v. Charles Caracciolo Steel & Metal Yard, Inc.,* 777 A.2d 1090, 1095 (Pa.Super.2001).

■ ¶ 34 SPCA deprived Snead of her use and possession of the dogs, which are

considered property in Pennsylvania, when it euthanized them. When Snead came to the shelter on January 27, 1999, three days before the dogs were put down and after the dog-fighting charges had been dropped, she was entitled to seek return of the dogs.[15] (Notes of testimony, 7/6/05 at 172.) SPCA failed to give Snead the opportunity to retrieve her dogs after the charges were dropped and they were no longer needed as evidence, thereby unlawfully depriving her of her chattel.

■ ¶ 35 Next, SPCA argues that the trial court erred in denying its motion for remittitur. SPCA argues that Snead failed to establish SPCA acted with an evil motive or reckless indifference such that would support the imposition of punitive damages. With this proposition, we agree.

Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. Further, [P]unitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct. Because punitive damages are intended to punish the tortfeasor for outrageous conduct and to deter him and others like him from similar conduct in the future, [t]he state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious.

*Hutchison ex rel. Hutchison v. Luddy*, 896 A.2d 1260, 1265 (Pa.Super.2006) (internal quotation marks and citations omitted).

The only purpose of punitive damages is to deter outrageous conduct. It is impossible to deter a person from taking risky action if he is not conscious of the risk. Thus, in *Feld v. Merriam*, 506 Pa. 383, 485 A.2d 742 (1984), [our supreme court] addressed the issue of when punitive damages are warranted and stressed that, in determining whether certain conduct is outrageous, '[t]he state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious.' Similarly, [Section 500 of] the Restatement explains that 'reckless indifference to the rights of others and conscious action in *deliberate* disregard of them ... may provide the necessary state of mind to justify punitive damages.'

*Id.* at 1266, quoting *Hutchison v. Luddy* ("*Hutchison IV*"), 582 Pa. 114, 123–124, 870 A.2d 766, 771–772 (2005) (additional citations omitted) (emphasis in *Hutchison IV*). "Therefore, an appreciation of the risk is a necessary element of the mental state required for the imposition of such damages." *Id.*

As the *Hutchison IV* court therefore opined: 'Thus, in Pennsylvania, a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he

---

15. Whether the dogs, in fact, would ultimately have been returned to her is in question based on their condition. Spencer testified that where an animal had been seized due to cruelty by the owner, it would not be returned even if the owner wanted it. (Notes of testimony, 7/6/05 at 82–83.) Spencer testified the dogs were emaciated and suffered from sores, eczema, and dermatitis, and were not in a condition to be returned to their owner. (*Id.*

at 115–116, 131.) However, Officer Beltram testified that when the felony dog-fighting charges were dropped, the animals were available for redemption by the owner, although it would not have been automatic; Officer Beltram testified he would have had to order the house cleaned and a pre-inspection done before the animals were permitted to return to that environment. (*Id.* at 154–155, 202.)

acted, or failed to act, as the case may be, in conscious disregard of that risk.' *Id.*, quoting *Hutchison IV, supra* at 124, 870 A.2d at 772, citing *Martin v. Johns–Manville Corp.*, 508 Pa. 154, 171–172, 494 A.2d 1088, 1097–1098 (1985) (plurality).

¶ 36 Certainly, for the reasons discussed above, we agree the evidence was sufficient for the jury to find SPCA was negligent; however, the evidence does not support a conclusion that Spencer and/or Beltram acted with intent or malice in euthanizing Snead's dogs. Although, as the prevailing party in the court below, we must accept Snead's testimony that she went to the shelter on January 27, 1999 and was erroneously informed by Spencer that her dogs were dead,[16] this establishes nothing more than mistake or accident on Spencer's part. Indeed, Spencer testified that he was responsible for approximately 40,000 animals per year, and that on January 23, 1999, when the dogs were brought in by Officer Beltram, he was informed that Snead was involved but was not aware that they actually belonged to her. (Notes of testimony, 7/6/05 at 62, 67, 130.) Furthermore, because the dogs did not bear license tags (*id.* at 122–124), they were considered strays and it was SPCA's policy that they only need to be held for 48 hours; as of January 27, 1999, four days after they were brought in and after the dog-fighting charges were dropped, Spencer may simply have assumed that they had been put down. Spencer testified that, in his opinion, the animals were not in a condition to be adopted. (*Id.* at 131.) At any rate, there is simply no evidence to impute to Spencer or SPCA evil motive or reckless indifference to the rights of Snead. Even accepting Snead's testimony as true and resolving all reasonable inferences in her favor, we cannot say that SPCA acted in conscious disregard of a risk of harm to Snead when it euthanized the animals. Therefore, we reverse the award of $100,000 in punitive damages and will re-enter judgment accordingly.

¶ 37 SPCA also argues that the punitive damages award should be reduced because it bears no reasonable relation to Snead's actual damages and is constitutionally excessive. Obviously, this issue is rendered moot by our disposition of the previous issue, and we need not address it.

■ ¶ 38 Now, we turn to Snead's cross-appeal, seeking attorney's fees. The trial court denied Snead's post-trial motion for imposition of attorney's fees, finding that she was adequately compensated by the jury's award of damages and noting that there was evidence of record that the dogs had been mistreated. (Trial court opinion on cross-appeal, 2/1/06 at 3.) We are constrained to disagree and determine that because Snead prevailed on the Section 1983 civil rights claim, which we have affirmed for the reasons discussed *supra*, she is entitled to reasonable attorney's fees.

¶ 39 Courts have authority to award attorney's fees in civil rights cases under 42 U.S.C. § 1988(b), which provides that in any action to enforce a provision of Section 1983 of that title, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." In interpreting Section 1988, the United States Supreme Court has stated that as a general rule, a prevailing plaintiff should recover attorney's fees unless special circumstances exist that would render such an award unjust. *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40

---

**16.** This account was corroborated by Snead's mother, who testified she accompanied Snead to the shelter. (Notes of testimony, 7/7/05 at 189–190.)

(1983). Although the Supreme Court has not articulated a bright-line rule for determining when special circumstances are present, other courts have observed that "special circumstances should not be easily found." *Cleveland v. Ibrahim*, 121 Fed. Appx. 88, 90 (6th Cir.2005), citing *Blanchard v. Bergeron*, 489 U.S. 87, 96, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989); *see also Inmates of Allegheny County Jail v. Pierce*, 716 F.2d 177 (3d Cir.1983).

¶ 40 In *Farrar v. Hobby*, 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), the Supreme Court discussed the factors that should guide a court's decision to award attorney's fees in a civil rights action. In that case, the plaintiffs sought $17 million in damages for alleged civil rights violations, but a jury awarded them one dollar based on its determination that the defendant's misconduct was not "a proximate cause of any damages" sustained therein. *Id.* at 106, 113 S.Ct. 566. The federal district court awarded the plaintiffs $280,000 in counsel fees, but the Fifth Circuit Court of Appeals reversed that award, reasoning that the plaintiffs did not actually prevail at trial because they sued purely for monetary damages, requesting $17 million, but recovered only one dollar. The plaintiffs appealed, and the Supreme Court granted *certiorari*.

¶ 41 In reviewing the Fifth Circuit's ruling, the Supreme Court clarified that counsel fees can be awarded to any party that prevails on the merits of a civil rights claim because "[l]iability on the merits and responsibility for fees go hand in hand...." *Id.* at 109, 113 S.Ct. 566, quoting *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). However, the Court also reiterated that attorney's fees are not recoverable in every instance where a civil rights violation has occurred, stating that "[w]hen a plaintiff recovers only nominal damages be-

cause of his failure to prove an essential element of his claim for monetary relief, ... the only reasonable fee is usually no fee at all." *Id.* at 115, 113 S.Ct. 566. In accordance with that principle, the *Farrar* Court affirmed the Fifth Circuit's denial of counsel fees, observing that the jury awarded nominal damages in that case because the plaintiffs failed to prove proximate causation, which was an essential element of the underlying cause of action.

¶ 42 In the case at bar, Snead prevailed on the merits of her civil rights claim, and the jury awarded her approximately $54,000 in compensatory damages. The trial court, however, denied Snead's posttrial motion for attorney's fees under 42 U.S.C. § 1988(b), stating as follows:

In the instant case the evidence was sufficient for the jury to find a Section 1983 violation, but justice does not require that [Snead] should benefit by an additional award of attorney's fees. [Snead] mistreated her dogs both at the time immediately preceding the civil rights violation as well as in the past. The jury could not weigh that factor with respect to their verdict, but this Court finds it necessary to do so at this juncture. Given the underlying facts of this case, the violations against [Snead's] civil rights do not rise to the level of egregiousness contemplated by the statute. The totality of the circumstances, and the amount of the award, show a fair result without allowing [Snead] to recover what it cost her to sue in the first place.

Trial court opinion, 2/1/06 at 3.

¶ 43 The decision to deny counsel fees based on Snead's misconduct is inappropriate because it violates United States Supreme Court precedent and undermines the legislative intent behind the enactment of 42 U.S.C. § 1988. The Supreme Court has unequivocally stated that counsel fees

are to be awarded based on the extent of the plaintiff's success in proving that his civil rights were violated. *See Farrar, supra* at 114–116, 113 S.Ct. 566. Thus, if the plaintiff establishes that his rights were violated in a manner that caused "actual, compensable injury," a reasonable fee should be awarded. *Id.* at 115, 113 S.Ct. 566. The plaintiff's character should not factor into this determination, and fees should not be awarded or withheld as a punitive measure.

¶ 44 In *Simpson v. Sheahan,* 104 F.3d 998 (7th Cir.1997), the Seventh Circuit further elaborated on the proper purpose for the award of attorney's fees in civil rights actions. In determining that an award of attorney's fees as a sanction against a defendant is an improper purpose, the court explained that Congress enacted Section 1988 in an effort to induce competent attorneys to litigate meritorious civil rights claims on behalf of individuals who often cannot afford to hire private counsel. *Id.* at 1002–1003. Moreover, attorney's fees are not a substitute for compensatory or punitive damages. *Id.* at 1003. As the district court violated this rule by crafting a fee award that was punitive in nature, the Court of Appeals vacated and remanded for calculation of a new award.

¶ 45 Under the reasoning of *Farrar* and *Simpson,* we find that the trial court erred in denying counsel fees based on its determination that: (1) Snead did not deserve to recover such fees because she abused the dogs; (2) the civil rights violation herein was not sufficiently egregious to support an award of attorney's fees; and (3) the $54,000 compensatory damage award was "a fair result." (Trial court opinion, 2/1/06 at 3.) This was an abuse of discretion, as the proper inquiry was whether Snead proved all of the material elements of her cause of action and demonstrated a compensable injury. *Farrar, supra.* Since

Snead established a constitutional violation and received $54,000 in compensatory damages, she was successful in proving her case against SPCA and therefore should have recovered reasonable attorney's fees under *Farrar* and its progeny. *Compare id.* at 117, 113 S.Ct. 566 (where a prevailing plaintiff has achieved only a Pyrrhic victory that can be characterized as purely technical or *de minimis,* no fees can be awarded) (O'Connor, J., concurring).

¶ 46 Judgment affirmed in part and reversed in part. Case remanded for entry of judgment on compensatory damages and counsel fees. Jurisdiction is relinquished.

¶ 47 McEWEN, P.J.E. files a Concurring and Dissenting Statement.

CONCURRING AND DISSENTING STATEMENT BY McEWEN, P.J.E.:

¶ 1 The author of the Opinion in the case has so perceptively analyzed and sagaciously addressed the substantive issues of these appeals that I join in the decision of the majority with but the single exception that I agree with the ruling of the eminent Judge Edward E. Russell that denied counsel fees to plaintiff Snead.